**STATE of South Dakota, Plaintiff and Appellee,**

v.

**David JAQUES, Defendant and Appellant.**

**No. 15823.**

Supreme Court of South Dakota.

Argued April 27, 1988.
Decided Aug. 17, 1988.

Mark Smith, Asst. Atty. Gen., Pierre, (Roger A. Tellinghuisen, Atty. Gen., on the brief), for plaintiff and appellee.

John P. Billings of Bogue, Weeks, Rusch & Billings, Vermillion, for defendant and appellant.

HENDERSON, Justice.

## PROCEDURAL HISTORY/ISSUES

Defendant David Jaques (Jaques) was charged with one count of second-degree murder and three counts of first-degree manslaughter for his involvement in events leading to the death of Martin Gray (Gray). After a jury trial in the circuit court for Clay County, Jaques was convicted on one count of first-degree manslaughter and sentenced to 35 years in the State Penitentiary. The jury acquitted Jaques on the other counts. Codefendant Elijah Sitting Crow (Sitting Crow), tried in the same proceeding, was found guilty of second-degree manslaughter. Sitting Crow's conviction was affirmed in *State v. Sitting Crow*, 428 N.W.2d 268 (S.D.1988).

Jaques appeals his conviction alleging trial court error regarding six issues:

1. Admission into evidence of a jailhouse note, written by Jaques to Sitting Crow, which was seized by jail officials;

2. Denial of court-appointed expert assistance;

3. Jury instructions regarding self-defense were inappropriate;

4. Use of a non-testifying codefendant's statement for impeachment purposes denied Jaques his constitutional right of confrontation;

5. Sufficiency of evidence to support his conviction; and

6. Denial of Jaques' motion for severance.

These issues are treated seriatim. We affirm.

## FACTS

On October 9, 1986, Jaques, Sitting Crow, Teresa Peterson (Jaques' sister, married to Sitting Crow), and Angelique Johnson (Gray's fiancee) were drinking beer and wine at Sitting Crow's house in Vermillion. All except Johnson lived in the house. Johnson was visiting Jaques, for whom she felt a romantic inclination.

That evening, Gray came by looking for Johnson. Told by Peterson that Johnson had left earlier, Gray departed. He returned later, again seeking Johnson, and was let into the house. At this point, Johnson was hiding in a closet in a back room, closely attended by Jaques. Gray, Sitting Crow, and Peterson conversed for a half-hour or so. A fight broke out, according to Peterson, when Gray, without provocation, struck Sitting Crow on the head with a wine bottle. Gray, we are told, grabbed a skillet as a weapon, Sitting Crow wrestled with Gray, Peterson fled to a back room, and Jaques came forward to help Sitting Crow. In the process, Jaques picked up a stick used as a window prop.

Testimony differed as to what happened after the melee developed inside the house. The defendants claimed that they struck Gray only in the course of the fight, which boiled out the door and continued for a few minutes outside. This was contradicted by Sitting Crow's statement, dictated to police, to the effect that he had tackled Gray inside the house when Gray attempted to escape, and beat Gray into unconsciousness after telling Gray that he would have to "give some blood" for what he had done. Also, two neighbors testified that Gray was beaten repeatedly while begging to be allowed to leave.

Police and an ambulance were summoned by the neighbors at Peterson's request. Gray was found unconscious on the neighbor's property, having been dragged there by the defendants. He died the next day of multiple head injuries and an associated skull fracture. Colored photographs, received in evidence, graphically depicted Jaques' bootprints on the head of the corpse. The theory of defense was not that Jaques and Sitting Crow, acting jointly, did not kill Gray, but that their beating of Gray was justifiable or excusable.

## DECISION

### I. THE JAILHOUSE NOTE

 Codefendant Sitting Crow, while he and Jaques were incarcerated in the Clay County Jail, asked a jailer to pass a note to Jaques. When the jailer asked if he could read it, Sitting Crow agreed. The jailer took it to a deputy, who photocopied it and allowed the jailer to deliver it to Jaques, although jail regulations forbid this. Jaques wrote a letter in reply, which a different jailer delivered to Sitting Crow. The second jailer later asked Sitting Crow for the letter from Jaques, and Sitting Crow voluntarily gave it up. Jaques' letter contained references to Jaques' culpability regarding Gray's death, and was later admitted into evidence at trial. There is no detail, however, in the note regarding what actually occurred during the Gray incident.

Jaques now claims that the reading and use as evidence of this prison note violated his Fourth (unreasonable search and seizure), Fifth (self-incrimination), and Sixth (right to counsel) Amendment constitutional rights. These arguments are unfounded, as is Jaques' assertion that the State induced Jaques to write the letter, an allegation not supported by the evidence.

The law is well settled that prison officials can read prisoner-to-prisoner messages voluntarily given to prison orderlies even where such deliveries are unauthorized. *Denson v. United States*, 424 F.2d 329 (10th Cir.1970), *cert. denied*, 400 U.S. 844, 91 S.Ct. 88, 27 L.Ed.2d 80 (1970) (adopting the rationale of *Stroud v. United States*, 251 U.S. 15, 40 S.Ct. 50, 64 L.Ed.

103 (1919)). The *Denson* decision, rejecting Fourth and Fifth Amendment claims as there is no coercion or unlawful interrogation, and no unreasonable search and seizure, is still good law. *See People v. Morones*, 39 Colo.App. 451, 569 P.2d 336 (1977); *Perry v. State*, 505 N.E.2d 846 (Ind. App.1987); *Thomas v. State*, 285 Md. 458, 404 A.2d 257 (1979). There is also no Sixth Amendment violation unless the prison officials prevent or significantly impair an inmate's right to counsel. *See* Annot., *Censorship and Evidentiary Use of Unconvicted Prisoners' Mail*, 52 A.L.R.3d 548, 553 (1973). No interference with Jaques' access to counsel appears in this record. We find no illegal search and seizure, interrogation, or infringement of Jaques' right to counsel.

### II. EXPERT ASSISTANCE AND CONTINUANCE

Jaques argues that he was denied due process of law when the trial court refused his requests for court-appointed experts to analyze physical evidence held by the State. This evidence and results of tests by State experts were made available to the defense one day before the motion hearing concerning Jaques' request for expert assistance, and two and one-half weeks before trial. The defense also requested a continuance to allow time for experts to analyze the released material. Specifically, Jaques requested: 1) examination of a knife for fingerprints; 2) examination of the skillet used by Gray for fingerprints and bloodstains; 3) analysis of Gray's clothing for blood and hair evidence; 4) analysis of Sitting Crow's and his own clothing for blood and hair evidence; 5) examination of the wine bottle fragments; 6) examination of a mop used to clean blood off the floor of the Sitting Crow house; and 7) appointment of an expert to reconstruct Gray's blow to Sitting Crow's head.

Jaques supports this argument by citing *United States v. Patterson*, 724 F.2d 1128, 1130 (5th Cir.1984):

> [W]here the government's case is heavily dependent on evidence with regard to which a government expert testifies and

the defendant has been denied the appointment of an expert, such evidence is sufficiently crucial to the government's theory that denial of a defense expert constitutes reversible error.

The Fifth Circuit's reasoning in *Patterson* is based on *Bradford v. United States*, 413 F.2d 467 (5th Cir.1969) (government case based on fingerprint and handwriting expert testimony, and corroborated only by testimony of a codefendant who had pled guilty). In *Patterson* itself, the government case was built on conflicting eyewitness testimony, a possibly racially tainted in-court identification, and fingerprint analyses by three government witnesses. *Patterson*, 724 F.2d at 1130–31. Jaques buttresses his argument with *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed. 2d 53 (1985), wherein the United States Supreme Court recognized a state's duty to make certain that an indigent defendant must have access to the materials needed to build an effective defense.

■ The guidelines for determining when court-appointed experts are essential to an adequate defense are: 1) The request must be made in good faith; 2) the request must be reasonable in all respects; 3) the request must be timely and set forth reasons which seem to make such services needed or necessary to the defendant, and 4) the request must specify that the defendant is financially unable to obtain the required service himself and that such services would otherwise be justifiably obtained if the defendant were financially able. *State v. Sahlie*, 90 S.D. 682, 690, 245 N.W.2d 476,480 (1976). *See also State v. Hallman*, 391 N.W.2d 191 (S.D.1986). However, if the request is frivolous, unreasonable, unnecessary for an adequate defense, or without underlying factual support, the appointment need not be made. *Hallman, id.* at 194; *Sahlie*, 90 S.D. at 691, 245 N.W.2d at 480.

■ The State argues that the defense requests were unreasonable or unnecessary for an adequate defense. We agree. The knife was not used in the fight, and

analysis, at best, might have been useful to weakly impeach Johnson's credibility regarding her testimony that both defendants had picked up the knife in the course of the evening. The State expert indicated that no prints sufficient for identification were on the knife blade or sheath and no blood or fingerprint evidence linking the defendants to the knife was offered. Regarding the skillet, the government witness testified that Sitting Crow's blood was on it, substantiating the testimony that Gray used it against Sitting Crow, and no evidence was presented contradicting the defendants' claims regarding it. As to the blood and hair evidence on clothing, again, there is no dispute that there was a fight at close quarters, with blood all about. Further testing would have proved little. The wine bottle's use by Gray was not contradicted, nor was the blood on the floor. Testing of the mop and bottle would be superfluous. Finally, the request for reconstruction of Gray's blow with the bottle to Sitting Crow's head was not essential in any sense, and true reconstruction after the Sitting Crow household had gathered up the glass, moved the furniture, and mopped the floor was impossible. Expert assistance and a continuance were not necessary to prepare an adequate defense.

Contrary to the defendant's claim, the fingerprint and blood evidence was not the essential basis of the State's case, for that was provided by the statements of the defendants and other eyewitnesses (the neighbors). Absent abuse of discretion, the trial court's decision regarding appointment of an expert will not be tampered with. *Hallman*, 391 N.W.2d at 195. Here, the trial court did not abuse its discretion. *Id.*

### III. THE SELF–DEFENSE INSTRUCTIONS

■ Jaques challenges the trial court's use of two instructions to the jury which were based, he alleges, on the law of self-defense, not justifiable or excusable homicide.[1] We are urged to reject them on the

---

1. The challenged jury instructions are Nos. 62 and 63:

grounds that the instructions reflect an objective "reasonable person" standard, which is appropriate only in cases involving a defendant threatened with simple assault or other non-lethal offenses, but not when facing a charge of homicide. As support, defendants cite the California Pattern Jury Instructions regarding justifiable homicide (CALJIC § 5.12) and self-defense against assault (CALJIC § 5.30), indicating that these are separate defenses. Rather than an objective "reasonable person" standard, defendants assert that in cases involving threatened homicide or serious bodily injury, a defendant may respond with "whatever force he deems necessary." [2]

While justifiable or excusable homicide doctrine is separate from self-defense against a non-lethal assault, the division between the doctrines is not based on applicability of a "reasonableness" standard. The California pattern instructions cited by the defendants do not indicate that an objective standard is used in one defense and a subjective standard in the other. On the contrary, CALJIC § 5.12 (Justifiable Homicide in Self–Defense) and CALJIC § 5.30 (Self–Defense Against Assault) both utilize an "objective" reasonable person standard.

Jaques' main argument, although never stated as such, is that they were justified in using lethal force because the evidence showed that Gray threatened Sitting Crow with serious bodily injury, in his own dwelling, and Instruction No. 62 indicates that force used must be limited to what a reasonable person would believe necessary. As stated in *State v. Woods*, 374 N.W.2d 92, 97 (S.D.1985), "any force ... would have been lawful force" in repelling a burglar from one's home under SDCL 22–16–34. The defendant's point is well taken that the court's jury instructions (No. 54) [3] regarding justifiable homicide when opposing a felony within one's dwelling apparently conflicts with the "reasonable force" available under No. 62.

This conflict, however, is more of form than substance. The court's instructions, taken as a whole, indicate that the jury could find Jaques not guilty if he reasonably believed he was faced with a felony (serious bodily harm) within the dwelling and killed Gray to prevent the harm. Some testimony depicted Gray as fighting until he collapsed, which, if believed by the jury, could justify Instruction No. 54 or Instruction No. 52 (heat of passion). However, extensive evidence indicated that Gray was beaten, kicked, and clubbed after he had been disarmed (he lost the bottle and skillet early in the engagement, inside the house, and from then on was unarmed). There being no threat of serious bodily harm to defendants at that point, the use of force becomes limited to that which is reasonable

---

Jury Instruction No. 62 reads:
> The kind and degree of force which a person may lawfully use in self-defense are limited by what a reasonable person in the same situation as such person, seeing what he sees and knowing what he knows, then would believe to be necessary. Any use of force beyond that is regarded by the law as excessive. Although a person may believe that he is acting, and may act, in self-defense, he is not justified in using a degree of force clearly in excess of that apparently and reasonably necessary under the existing facts and circumstances.

Jury Instruction No. 63 reads:
> A person who defends himself against unlawful attack must stop the use of force as soon as danger of attack has ended. If it would appear to a reasonable man in the same position that there is no further danger, then there should be no further force.

2. For authority on this point, defendants rely on *People v. Guenther*, 740 P.2d 971 (Colo.1987):

> [W]e hold that section 18–1–704.5 provides the home occupant with immunity from prosecution only for force used against one who has made an unlawful entry into the dwelling, and that this immunity does not extend to force used against non-entrants.

*Guenther*, 740 P.2d at 979. The Colorado statute, however, is radically different from our own, and contains specific language exempting homeowners from other statutory requirements. *Guenther*, 740 P.2d at 974. *Guenther* has no bearing on this case.

3. Jury Instruction No. 54 (based on SDCL 22–16–34) reads:

> A homicide, that is, the killing of one human being by another, is justifiable when committed by any person when resisting any attempt to murder such person or to commit any felony upon him or her or upon or in any dwelling house in which such person is.

in the circumstances, and, as the threat of harm dissipates, so does the reasonableness of the force used. This Court faced a similar question in *State v. Stumbaugh*, 28 S.D. 50, 132 N.W. 666 (1911), where the decedent assaulted the defendant with an axe on the defendant's property:

> The defendant admits that he made no attempt to retreat, and the evidence quite clearly shows that the statement made by the deceased that the defendant immediately drew his pistol and commenced firing at him, after the alleged assault by the deceased, was in fact true, as it is quite apparent from the place where the pool of blood and ax were found—some 12 feet distant from the fence—that the deceased had retreated, and was in the act of going away, before the shots were fired by the defendant; and this theory is strongly corroborated by the fact that the deceased was shot in the back, and at a point quite distant from the fence. It is quite clear, therefore, that the evidence was such as to warrant the jury in believing that there was no such actual or apparent danger to the defendant, or danger of great personal injury, as authorized him to take the life of the deceased, and that he could have avoided the killing by withdrawing from the scene without danger to himself, either actual or apparent.

*Stumbaugh*, 28 S.D. at 69, 132 N.W. at 674.

Here, where evidence established that Gray was disarmed inside defendant's dwelling, and the neighbors testified that Gray was clubbed, kicked, and beaten while outside the house, and Gray's head exhibited multiple boot imprints, the jury was properly instructed to consider the reasonableness of the force applied by defendants. The court's instructions, taken as a whole, were adequate. Jaques' argument is without merit.

## IV. USE OF SITTING CROW'S OUT-OF–COURT STATEMENT FOR IMPEACHMENT PURPOSES

■ At trial, the following exchange took place:

Prosecutor: Okay, do you recall when you came back inside and your conversation with Angelique and Teresa, whether or not you and Elijah said that "You would kill that bastard," and that is the time that Elijah looked for the knife?

Defense Counsel: I would object, improper cross-examination.

Court: Overruled.

Jaques: I don't remember anything like that being said, no.

For the following reasons, we deem that Jaques' constitutional right to confront witnesses was not violated: 1) The question itself does not indicate who made the statement. 2) Although Jaques argues, essentially, that prosecutorial misconduct occurred, he failed to make a motion for mistrial, failing to preserve this issue on appeal. *State v. Dace*, 333 N.W.2d 812, 822 (S.D.1983); *State v. Luna*, 264 N.W.2d 485, 491 (S.D.1978) (failure to properly object or move for mistrial). 3) Jaques said no, so no evidence incriminating Jaques was placed on the record. 4) The objection made was not definitive nor specific enough to alert the trial judge as to the exact grounds for objection. SDCL 19–9–3(1); *State v. Rufener*, 401 N.W.2d 740 (S.D.1987) (the objection could have been obviated if specifically formulated). 5) Were this deemed to be error, which achieved a constitutional dimension, notwithstanding, it would be deemed harmless because of the overwhelming weight of evidence depicting Jaques' guilt such that it is clear beyond a reasonable doubt that the jury would have returned a conviction. *State v. Garritsen*, 421 N.W.2d 499 (S.D. 1988); *High Elk v. State*, 344 N.W.2d 497 (S.D.1984).

## V. SUFFICIENCY OF THE EVIDENCE

■ The trial court denied Jaques' motions for acquittal at the end of the State's case and after the defense presented evidence. Jaques asserts that the State failed to prove beyond a reasonable doubt that the killing was done in a cruel and unusual manner, an element of the first-degree

manslaughter count of which Jaques was convicted. We disagree.

The evidence established that at least three blows to Gray's head bore the imprints of Jaques' boots. Similar imprints marked Gray's body. One witness testified that Gray pleaded to be released four or five times while the beating continued. During that period, Jaques was observed, by two neighbors, striking Gray with a stick. After they were done with him, the defendants dragged Gray's unconscious body to the neighbor's yard and left him.

Sufficiency of trial evidence rests on whether the evidence, if believed by the jury, is sufficient to find guilt beyond a reasonable doubt. *State v. Andrews*, 393 N.W.2d 76,80 (S.D.1986) (citing *State v. Faehnrich*, 359 N.W.2d 895 (S.D.1984)). The factual basis supporting a manslaughter charge grounded in a cruel and unusual manner must show that the killing was done with " 'some refinement or excess of cruelty sufficiently marked to approach barbarity, and to make it especially shocking....' " *State v. Lange*, 82 S.D. 666, 671, 152 N.W.2d 635, 638 (1967) (citation omitted). While death from a single shove in a drunken street brawl is not cruel and unusual, a prolonged beating of a woman by a drunken defendant outweighing her by 100 pounds is sufficient to reach the jury on the point. *Lange, id.* Here, the defendants clubbed, kicked, and pounded Gray after resistance ceased. If bludgeoning with a crowbar can sustain a first-degree manslaughter conviction, *Graham v. State*, 346 N.W.2d 433 (S.D.1984), such a conviction was supported here.

## VI. SEVERANCE

Jaques next argues that he and Sitting Crow should have been tried separately, as there was a disparity of evidence against the two defendants (*State v. Andrews*, 393 N.W.2d 76), and there was too much evidence for the jury to be able to separate the evidence against one defendant from that bearing on the other. This argument is based on *Andrews*, 393 N.W. 2d 76, and *United States v. Kelly*, 349 F.2d 720 (2d Cir.1965). *Kelly* is not apt, as that was a huge stock fraud conspiracy case involving a nine-month trial, an 18,000–page trial transcript, a 160–count indictment, 1,500 exhibits, and at least 62 witnesses. *Kelly*, 349 F.2d at 727. To compare a ten-day, two-defendant homicide case to a behemoth like *Kelly* is manifestly absurd.

As to severance in general, the granting of such is not a matter of right, but rests in the discretion of the court, to be exercised in the interest of justice. SDCL 23A–11–2; *Andrews*, 393 N.W.2d at 79. Admission of evidence against only one of several defendants does not on its own justify reversal when proper limiting instructions are given to the jury. *Andrews, id.* Such instructions were given. The trial court did not abuse its discretion. The main defense offered by both defendants was that Gray's death was justifiable or excused. This concept did not play one defendant off against the other. Independent witnesses saw this savage beating by both defendants. Jaques was observed wielding a stick, and his bootprints were linked to three of Gray's head wounds. Sitting Crow admitted to beating Gray into unconsciousness. Gray died of multiple head wounds and an associated skull fracture. Expert testimony established that all blows to Gray's head contributed to his death. We do not have a scenario before us of where Jaques and Sitting Crow are denying involvement. Therefore, the evidence establishing the elements of the crime was not of great disparity or variation. Defendant's strategies were not antagonistic, and no real prejudice resulted. *State v. No Heart*, 353 N.W.2d 43, 47 (S.D.1984).

The judgment is affirmed.

WUEST, C.J., MILLER, J., and FOSHEIM, Retired J., concur.

SABERS, J., concurs specially.

FOSHEIM, Retired J., sitting for MORGAN, J., disqualified.

SABERS, Justice (specially concurring).

Even though Jaques is not able to establish a specific violation of his rights under the Fourth, Fifth, or Sixth Amendment to

the United States Constitution or similar provisions of the South Dakota Constitution, the jailer should have known that the note from Sitting Crow, which he delivered to Jaques, would induce a response. From the content of Sitting Crow's note, the jailer should have known that Jaques' response would be culpatory, if not incriminating. The substance of the note was devastating to Jaques' position. It essentially handcuffed his attorney's argument to the jury because, in effect, it stated that Jaques told his attorney the truth and that in response to this truth Jaques' attorney told him that he would be imprisoned for his conduct. Though the substance of this note was not very probative of any specifics, it was extremely prejudicial to Jaques' defense of self-defense or justifiable homicide. For these reasons, the note should have been excluded from the jury under these circumstances.