## STATE of South Dakota, Plaintiff and Appellee,

v.

## Elijah SITTING CROW, Defendant and Appellant.

### No. 15815.

Supreme Court of South Dakota.

Argued April 27, 1988.

Decided Aug. 17, 1988.

Mark Smith, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

James E. McCulloch of Minick, Nelson & McCulloch, Vermillion, for defendant and appellant.

HENDERSON, Justice.

### PROCEDURAL HISTORY/ISSUES

Defendant Elijah Sitting Crow (Sitting Crow) was indicted on one count of second-degree murder and three counts of first-degree manslaughter for his involvement in

events leading to the death of Martin Gray (Gray). A jury trial was held in the circuit court for Clay County resulting in Sitting Crow's conviction of second-degree manslaughter, a lesser-included offense. Sitting Crow was sentenced to ten years in the State Penitentiary. Codefendant David Jaques (Jaques), tried in the same proceeding, was convicted of first-degree manslaughter and received a sentence of 35 years.

Sitting Crow appeals his conviction arguing that the trial court committed five errors:

1) Denial of court-appointed expert assistance;

2) Jury instructions regarding self-defense were inappropriate;

3) Evidence was insufficient to support his conviction;

4) Denial of his motion for severance; and

5) Deprivation of exculpatory evidence through redaction of Sitting Crow's pretrial statements.

We affirm on all issues. Issues 1, 2, and 4 were also raised in *State v. Jaques*, 428 N.W.2d 260 (S.D.1988), and are briefly discussed in this opinion. Issues 3 and 5 are thoroughly discussed on the merits.

### FACTS

Fundamentally, the facts of this case are the same as those set out in *State v. Jaques*, 428 N.W.2d 260. We restate them here, to some degree, but highlight the extent of Sitting Crow's participation in the homicide.

This case arose from events which took place in the evening on October 9, 1986. Looking for his fiancee, Angelique Johnson, Gray was admitted to Sitting Crow's house. Johnson was, at the time, hiding in the back of the house with Jaques. Gray apparently discovered or sensed Johnson's presence, and struck Sitting Crow in the face with a wine bottle. Gray's act appears to have been unprovoked. Sitting Crow wrestled with Gray, who grabbed a skillet as a weapon, with which he hit Sitting Crow. Jaques came forward to help Sitting Crow. It became a two-on-one engagement. An expert testified that Sitting Crow's blood was on the skillet.

Accounts vary as to what happened after that, however. Sitting Crow later dictated a statement to police which indicated that Gray tried to escape from the house, but was tackled by Sitting Crow. Sitting Crow related that Gray asked to be allowed to leave to which Sitting Crow replied: "You can't get away with pounding people in the face, you're going to have to give some blood for this." According to Sitting Crow's statement, he punched Gray "five to fifteen" times, until Gray lost consciousness.

Two neighbors, awakened by the altercation, observed Gray being beaten beside Sitting Crow's home. Ed Hogan saw Sitting Crow strike downwards at Gray, accompanied by loud sounds "like hitting a basketball," though the point of impact was hidden by a car. Both Hogan and his wife, Sandy, heard the victim vainly ask to be let go at the beginning of the beating. Both also saw Jaques striking Gray with a stick during this period.

After the struggle was over, Ed Hogan and Todd Krantz, Sandy Hogan's cousin, walked to the scene, and talked to Sitting Crow near Gray's body. Sitting Crow, during the conversation, kicked Gray twice in the head. According to Ed Hogan, Sitting Crow claimed to have chased Gray within the house, after Gray started the fight, caught Gray, and beat him. Sitting Crow and Jaques later claimed they struck Gray only during the course of a fight which began inside of the house and then boiled out the door and continued for a few minutes outside. Sitting Crow's statement to the police contradicts this and independent eyewitness testimony belies its truth.

Gray later died of multiple head traumas and a fractured skull. Colored photographs, admitted in evidence, graphically portray the severity of the wounds and trauma to Gray's head, if not the savagery, of this beating. Sitting Crow did not defend upon this theory: I did not kill Gray. Rather, he defended upon the basis that the beating/killing of Gray was justifiable

or excusable. A Clay County jury held otherwise.

## DECISION

### –Denial of Expert–

### –Jury Instructions–

### –Severance–

Three of the five issues raised by Sitting Crow are analyzed in *State v. Jaques*, 428 N.W.2d 260, where we affirmed the trial court. These are: Denial of court-appointed expert assistance and a continuance; appropriateness of jury instructions based on the law of self-defense; and denial of the defense's motion for severance. As in *Jaques*, we make the following determinations: Expert assistance and the continuance requested were unnecessary to prepare an adequate defense (*see State v. Hallman*, 391 N.W.2d 191 (S.D.1986)); the jury instructions complained of were correct statements of law and were appropriate given the evidence presented at trial (*see State v. Stumbaugh*, 28 S.D. 50, 132 N.W. 666 (1911)); and no abuse of discretion exists in trying these defendants together, as their strategies were not fundamentally antagonistic and no prejudice resulted (*see State v. Andrews*, 393 N.W.2d 76 (S.D.1986), and *State v. No Heart*, 353 N.W.2d 43, 47 (S.D.1984)).

### –Insufficiency of Evidence–

■ Sitting Crow's remaining two arguments do not exactly correspond to issues considered in *Jaques*, 428 N.W.2d 260. We first consider Sitting Crow's assertion that evidence was insufficient to support his conviction of second-degree manslaughter. Sitting Crow alleges that the State failed to link any blow by Sitting Crow to the injuries that caused Gray's death. We disagree.

Sitting Crow's complicity in the fatally savage beating of Gray was not viewed by the jury to establish first-degree manslaughter, and the jury deemed that it was second-degree manslaughter. First-degree manslaughter is defined under SDCL 22–16–15 as follows:

Homicide is manslaughter in the first degree when perpetrated:

(1) Without a design to effect death by a person while engaged in the commission of a misdemeanor involving moral turpitude;

(2) Without a design to effect death, and in a heat of passion, but in a cruel and unusual manner;

(3) Without a design to effect death, but by means of a dangerous weapon;

(4) Unnecessarily, either while resisting an attempt by the person killed to commit a crime or after such attempt shall have failed.

Manslaughter in the first degree is a Class 1 felony.

Second-degree manslaughter is defined under SDCL 22–16–20 as follows:

Any reckless killing of one human being by the act or procurement of another which, under the provisions of this chapter, is neither murder nor manslaughter in the first degree, nor excusable nor justifiable homicide, is manslaughter in the second degree. Manslaughter in the second degree is a Class 4 felony.

In determining the sufficiency of evidence on appeal, the question is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. *State v. Banks*, 387 N.W.2d 19, 27 (S.D.1986). In making that determination, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. *Id.* This determination " 'may depend upon the difference between pure speculation and legitimate inference from proven facts.' " *State v. Halverson*, 394 N.W.2d 886, 888 (S.D.1986) (quoting *Curley v. United States*, 160 F.2d 229, 233 (D.C.Cir. 1947)). Here, Sitting Crow's statement to the police reflected that he caught the fleeing victim, and, after refusing Gray's plea for release, he struck Gray numerous times until Gray was unconscious. Independent witnesses observed Sitting Crow striking Gray. After Gray was unconscious, according to the testimony of two neighbors, Sitting Crow kicked Gray in the head. The

coroner testified that all of Gray's head injuries contributed to his death. While Sitting Crow stresses a single passage where the coroner testified that Sitting Crow's kicks "could have" contributed to Gray's death, that passage does not convey the full impact of the coroner's testimony. Gray died of cumulative injuries, no single one of which was fatal. As the coroner observed: "The brain is kind of like a sponge in the sense that it can absorb just so much injury before someone dies as a result of that injury." In this context, aside from the kicks directed at Gray's head, the jury could infer that the blows referred to in Sitting Crow's own statement, as they resulted in unconsciousness, landed at least partly on Gray's head. The evidence supported the verdict.

The facts of this case justified Sitting Crow's conviction on the lesser-included offense of second-degree manslaughter. Unlike the codefendant Jaques, who was convicted of first-degree manslaughter, Sitting Crow wielded no weapon, and left no bootprints on Gray's head. These facts, regarding Sitting Crow, apparently cast sufficient doubt upon the greater offenses of second-degree murder and first-degree manslaughter for the jury to convict Sitting Crow of second-degree manslaughter. " 'There must be sufficient evidence ... when read in the light most favorable to the defendant, which would justify a jury in concluding that the greater offense was not committed and that a lesser offense was, in fact, committed.' " *State v. Rich,* 417 N.W.2d 868, 871 (S.D.1988) (citations omitted). *See also State v. Goodman,* 384 N.W.2d 677 (S.D.1986); *State v. Waff,* 373 N.W.2d 18 (S.D.1985). Here, unlike *Rich, Goodman,* and *Waff,* such evidence existed, and we find no error.

–Deprivation of Exculpatory Evidence Through Redaction–

■ Sitting Crow's last argument is that redaction * of a statement by Sitting Crow, describing the stick Jaques used in clubbing Gray, prejudicially created an impres-

sion that Sitting Crow himself had used the stick. This, Sitting Crow alleges, had the effect of suppressing exculpatory evidence, in violation of the principles set out in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (withholding of requested evidence by the prosecution favorable to defendant violates due process requirements). *Brady* is inapposite. Other courts have, however, encountered this question, holding that introduction of redacted statements is permissible "if all parts of the extrajudicial statements implicating any codefendants can be and are effectively deleted without prejudice *to the declarant." People v. Boggs,* 255 Cal. App.2d 693, 702, 63 Cal.Rptr. 430, 436 (1967) (emphasis added) (no prejudice resulted, however, where defendant's confession rendered him guilty as a matter of law). *See also People v. La Belle,* 18 N.Y. 2d 405, 276 N.Y.S.2d 105, 222 N.E.2d 727 (1966) (redaction of La Belle's statement not only eliminated prejudicial references to his codefendant but also eliminated those portions of the statement tending to exculpate La Belle); 2 W.R. LaFave & J.H. Israel, *Criminal Procedure,* § 17.2, at 366 (1984). Here, however, as in *Boggs,* we find no prejudice. As admitted into evidence, Sitting Crow's statement was amended to: "He also described the club to me that was used in the beating of Marty Gray, approximately three and a half feet long, had bark on it, a straight stick. He said after the fight he threw the stick into the trees west of his house." No evidence was ever introduced which indicated that Sitting Crow clubbed Gray with the stick. The stick, however, was matched to a wound on Gray's body, and the neighbors observed Jaques wielding it outside the house. Jaques testified that he himself struck Gray with the stick, having grabbed it at the start of the fracas. Given this evidence, there is simply no prejudice to Sitting Crow. The questioned portion of the statement was not inculpatory toward Sitting Crow as there was no accusation

* Redaction is editing a nontestifying defendant's extrajudicial statement to remove references incriminating a codefendant, where introduction into evidence of such references would deprive the codefendant of his Sixth Amendment right to confront hostile witnesses. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

that Sitting Crow used the stick against Gray. Therefore, there would be no possible exculpatory effect in admitting the unredacted statement. While we agree that introduction of his own redacted statements may sometimes deprive a defendant of due process, as in *La Belle*, 276 N.Y.S. 2d 105, 222 N.E.2d 727, we are not confronted with such a case.

We are totally convinced that Jaques and Sitting Crow received fair trials in Clay County. Therefore, having treated the issues established by the notice of appeal and the briefs herein, we affirm the conviction of second-degree manslaughter.

WUEST, C.J., SABERS and MILLER, JJ., and FOSHEIM, Retired Justice, concur.

FOSHEIM, Retired Justice, sitting for MORGAN, J., disqualified.