**STATE of South Dakota, Plaintiff and Respondent,**

v.

**Samantha Jo SABERS, Defendant and Appellant.**

**No. 16287.**

Supreme Court of South Dakota.

Considered on Briefs April 27, 1989.

Decided June 21, 1989.

Roger R. Gerlach, McCook County State's Atty., Salem, Janine Kern, Asst. Atty. Gen., Pierre, for plaintiff and respondent; Roger A. Tellinghuisen, Atty. Gen., Pierre, on the brief.

James A. Eirinberg of Carlsen, Carter, Hoy & Eirinberg, Sioux Falls, for defendant and appellant.

GILBERTSON, Circuit Judge.

## PRELIMINARY STATEMENT

Samantha Jo Sabers (Samantha) was convicted of second degree burglary, SDCL 22–32–3, aggravated assault, SDCL 22–18–1.1 and attempted first degree murder, SDCL 22–16–4 and 22–4–1. She appeals her conviction alleging three trial court errors. After reviewing the voluminous record and analyzing the issues presented, we affirm the conviction.

## FACTS

On August 10, 1987, Andrew Sabers (Andrew), an 88 year old veteran, was released from the Veteran's Administration Hospital in Sioux Falls following surgery. He returned to live in his apartment in Salem, South Dakota.

On September 6, 1987, Samantha, Andrew's granddaughter, along with her friend Julie Jaeb, a/k/a Julie Hunger (Jaeb),[1] arrived in Salem. The next day, shortly before noon, they drove to a service station to get a flat tire fixed. The owner testified that Samantha and Jaeb left the station on foot in the direction of Andrew's apartment prior to the tire being repaired.

Between 11:00 a.m. and 12:00 noon, Andrew received a visit from a woman claiming to be a representative of the Veteran's Administration (V.A.) who was supposedly there to see how his recovery was progressing. Andrew later identified this woman as Jaeb.

Jaeb asked to use the bathroom twice, claiming she had consumed a lot of coffee that morning. Andrew remained in his living room where he could see neither his bathroom nor his bedroom. After the two bathroom visits, Jaeb said she needed to go down town for a half an hour and would return later.

Upon her second arrival at Andrew's apartment Jaeb again asked to use the bathroom. According to the state's theory, she instead entered the bedroom and took $1,006 in cash from two billfolds in a jacket hanging in Andrew's closet. $500 of this was in $50 bills.

Earl Sabers admitted at trial that he had previously told his daughter, Samantha, that Earl's father, Andrew, kept money in Andrew's apartment. On September 7 Earl saw Samantha and Jaeb at his home around noon. Donnie Sabers, the operator of the gas station, testified that Samantha and Jaeb returned together to his station to claim their car and repaired tire about an hour after they had left.

In the next few days Andrew discovered the money was missing but did not report the matter to the police. On September 11 and 12 Jaeb was known to be in possession of many fifty dollar bills and other cash. Her sole source of income was a monthly A.D.C. check in the amount of $360. During this period of time, no one else was in Andrew's apartment other than his son Earl.

On September 18, 1987, Andrew received a call from the same woman who said she was the V.A. representative. She told Andrew that she would be coming back to see him again. This call was traced to the mobile home where Jaeb lived in Mission, South Dakota. At trial, the other adults who lived in the mobile home or had regular access to the mobile home's phone testified that they did not make that call.

Early in the afternoon of September 18, Jaeb and Bill Antoine (Antoine) drove from Mission to Salem. En route Jaeb admitted to Antoine that she had visited Andrew a few weeks before posing as a V.A. health representative. Upon arrival in Salem, they picked up Samantha.

The trio then headed for Mitchell. On the way, Antoine heard the women discussing their plan to make a duplicate key to Andrew's apartment. Samantha stated that she had surreptitiously obtained the key from her father Earl. After the key was made, the group returned to Salem.

That night, Samantha told Bill Westhoff (Westhoff), "they [Jaeb and Samantha] were going to do something drastic," and that if anybody asked him, he should state that Samantha and Jaeb were at a party all night. About 10:30, Samantha, Jaeb and Antoine left that gathering.

Antoine testified that the three drove around Salem and Samantha and Jaeb discussed going into Andrew's apartment. The two women left the car for approximately fifteen minutes. They returned nervous and excited. They stated that

---

1. Jaeb was jointly tried and convicted of the same offenses. Although her case is factually similar to Samantha's, Jaeb's appeal raises the legal issue of the propriety of the photo lineup and a live lineup in which she was identified by Andrew. *See State v. Jaeb,* 442 N.W.2d 463 (S.D.1989).

they "couldn't find it," and had awakened Andrew. They vowed to "try again." After driving around for a while and a possible second attempt at entry into the apartment, Samantha stated that Andrew had "got to go. He seen us."

Andrew testified that he locked the inside door before retiring on September 18, but left the outer door unlocked. About 11:45 he awoke and saw a woman in his bedroom rummaging through his dresser drawers. When she saw he was awake, she quickly left the apartment. He did not clearly see her face but, based on her build, thought it was the same woman who claimed to be the V.A. representative.

He discovered that $120 was missing from his wallet. He locked both the outside and inside doors and returned to bed. He did not call the police.

While the trio of Antoine, Jaeb and Samantha drove around, the two women discussed the situation. Samantha convinced Jaeb that Andrew must be killed. Further discussion between the pair resulted in a determination that a tire iron would be used to carry out this plan.

Jaeb was dropped off near Andrew's apartment. Samantha and Antoine continued to drive the car around Salem and were seen by a local policeman around 2:30 a.m. on September 19.

Andrew testified that between 2:00 a.m. and 3:00 a.m. a woman called through his partially open window, "Andy ... they took Earl to the hospital—to Sioux Valley Hospital with a heart attack. They want to get you ready to take you to the hospital." Andrew thought the woman was Samantha. He got up, turned on his kitchen lights and unlocked the outer door and inner door.

At this point the woman, who was actually Jaeb, rushed through the doorway. Andrew tried to get to the telephone to call the police. Jaeb pulled out a tire iron or similar device and struck Andrew repeatedly on the head. This attack took place in the lit kitchen. Andrew received eight or nine blows to his head and began bleeding profusely. Although severely injured, he maintained consciousness for most or all of the ordeal. The examining physician who treated Andrew later testified that any of these blows could have been fatal.

Andrew asked Jaeb to call the police. She pretended to make such a call, but she had previously ripped the cord off the telephone. Jaeb then told Andrew that her husband was across the street, and if he attempted to summon help, the husband would shoot Andrew with a gun. Jaeb then left, leaving Andrew lying on the floor bleeding heavily. Despite his serious injuries, Andrew was able to crawl to a neighboring apartment and summon help.

Jaeb returned to Samantha and Antoine who were waiting in the car. Jaeb said that there was blood all over Andrew's apartment and that she just kept hitting him. According to Antoine, they dropped off Samantha at her father's apartment and then headed back for Mission. On the way, at Jaeb's instructions, Antoine tossed the tire iron and telephone cord out the window.

Out of five women in a photo line-up Andrew identified Jaeb as his assailant on September 24. On October 2, 1987, he again identified Jaeb in a live line-up of six women of similar appearance. *See State v. Jaeb, supra.* At trial, Andrew identified Jaeb no less than six times as his attacker.

Jaeb and Samantha were indicted for second degree burglary concerning the September 7 incident. They were also indicted for first degree burglary, aggravated assault and attempted first degree murder in regard to the events of September 18 and 19. The jury convicted both of second degree burglary, aggravated assault and attempted first degree murder but acquitted them of the first degree burglary.

## ISSUE I

DID THE TRIAL COURT ABUSE ITS DISCRETION BY DENYING SAMANTHA'S MOTION TO SEVER TRIAL OF COUNT I OF THE INDICTMENT FROM COUNTS II THROUGH IV?

In dealing with the issues of joinder and severance of counts of criminal

charges, South Dakota has enacted legislation which is based on Federal Rules of Criminal Procedure §§ 8(a), 13 and 14. *State v. Closs*, 366 N.W.2d 138 (S.D.1985).

SDCL 23A–11–1 authorizes joinder of indictments or informations for trial.[2] The criteria for the trial court to follow when considering this issue is set forth in SDCL 23A–6–23:

> Two or more offenses may be charged in the same indictment or information in separate counts for each offense, if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

However, the satisfaction of one or more of these criteria does not automatically result in joinder. SDCL 23A–11–2 mandates that the trial court further analyze the joinder procedure in the context of potential prejudice to the party seeking severance when so requested by that individual:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires ...

The granting of severance is not a matter of right but rests with the discretion of the trial court, to be exercised in the interest of justice. *State v. Andrews*, 393 N.W.2d 76 (S.D.1986).

If the requirements of SDCL 23A–6–23 for joinder are met, then the burden of proof falls to the party opposing joinder to establish sufficient prejudice to justify severance of the joined counts. SDCL 23A–11–2. *State v. Dixon*, 419 N.W.2d 699 (S.D.1988). *See also United States v. Armstrong*, 621 F.2d 951 (9th Cir.1980). The quantum of prejudice that must be shown is set forth in *Dixon, supra;*

> Any joinder of offenses is apt to involve some element of prejudice to the defendant, since a jury is likely to feel that a [defendant] charged with several crimes must be a bad individual who has done something wrong. However, if the notion of involuntary joinder is to retain any validity, a higher degree of prejudice, or certainty of prejudice, must be shown before relief will be in order.

419 N.W.2d at 703, *citing State v. Hoffman*, 106 Wis.2d 185, 316 N.W.2d 143, 157 (1982). This showing by the party moving for severance is required to offset the purpose of joinder, judicial efficiency. *Dixon, supra.* In this case at bar, the trial court correctly noted, however, that the ultimate goal is a fair trial and that considerations of judicial economy cannot override such an important constitutional guarantee. *See Andrews, supra.*

In *Dixon, supra,* this court reaffirmed its standard of review concerning severance of joined counts under SDCL 23A–11.2. This court will not overturn a trial court unless that court abused its discretion. An abuse of discretion arises only where the party requesting severance of the joined counts can make a "clear showing of prejudice to substantial rights." In absence of such, the trial court's decision against severance will be affirmed.[3]

---

**2.** SDCL 23A–11–1 provides:
> A court may order two or more indictments or informations or both, to be tried together if the offenses and the defendants, if there is more than one, could have been joined in a single indictment or information. The procedure shall be the same as if the prosecution were under a single indictment or information.

**3.** In *Dixon* we noted that "a trend is developing that 'the most important consideration is whether evidence of one offense would have been admissible at a trial of the other offense ...' 1

Wright, Federal Practice and Procedure, *Joinder of Offenses & Defendants* § 143 (1982); *State v. Hoffman*, 106 Wis.2d 185, 316 N.W.2d 143 (1982); *State v. Hall*, 103 Wis.2d 125, 307 N.W.2d 289 (1981); *State v. McGuire*, 218 Neb. 511, 357 N.W.2d 192 (1984)." 419 N.W.2d at 702.

Arguably, Samantha's reliance on this "trend" is misplaced since the admission of other crimes or acts at her trial could be accomplished pursuant to SDCL 19–12–5. *See State v. Sieler*, 397 N.W.2d 89 (S.D.1986).

In the case at bar, the state made its initial showing for joinder required by SDCL 23A–6–11. The indictments alleged a common scheme to steal money from Andrew's apartment.[4]

Samantha's reliance on *Dixon, supra,* as authority for no common scheme or plan in her case is misplaced. In *Dixon,* we held that the defendant's burglary charges had no similarity with charges of intentional damage to property. The two crimes occurred at different times and places and had different victims. What is controlling from *Dixon* is the alternate holding that the two burglaries were properly joined under SDCL 23A–6–23. In that case, the same two persons burglarized the same business on two occasions; the victim was the same each time. Here Samantha and Jaeb were alleged to have burglarized Andrew's apartment on two occasions.

Samantha presents two theories which she believes demonstrate prejudice she sustained as a result of the trial court's failure to sever Count I from Counts II, III and IV. First, she maintains that Count I was by far weaker than Counts II, III and IV and joinder allowed the state to bootstrap its weightier evidence concerning the latter counts to unfairly bolster its supposedly weak case against her on Count I. This argument is neither supported by the evidence nor the outcome of the trial. The jury convicted Samantha of Count I (burglary on September 7, 1987) but acquitted her of Count II (burglary on September 18, 1987). In addition, the trial court carefully instructed the jury that each count must be considered on its own merit apart from the others.

The second claim of prejudice alleges that the case against Jaeb was substantial as to Count I and very minimal against Samantha. Joinder purportedly allowed the state to use the Jaeb evidence to con-

vict Samantha under a guilt by association theory. Were this the case, the proper motion would have been for severance of the parties pursuant to SDCL 23A–11–2, rather than severance of criminal counts. Samantha never made a motion for severance of parties. Further, the trial court properly instructed the jury that each defendant can only be convicted by evidence admitted against that specific defendant based on her own conduct.

In summary, the trial court did not abuse its discretion in refusing to grant severance of Count I from Counts II, III and IV.

### ISSUE II

DID THE TRIAL COURT ERR IN INSTRUCTING THE JURY THAT IT COULD CONSIDER WHETHER AN "ADMISSION" WAS MADE BY THE DEFENDANT?

■ Over Samantha's objection the trial court instructed the jury:

A statement made by a defendant other than at his trial may be an admission. An admission is a statement by a defendant, which by itself is not sufficient to warrant an inference of guilt, but which tends to provide guilt when considered with the rest of the evidence.

You are the exclusive judges as to whether an admission was made by the defendant and if the statement is true in whole or in part. If you should find that such statement is entirely untrue, you must reject it. If you find it is true in part, you may consider that part which you find to be true. It is for you to determine what weight, if any, to give a purported admission.

The basis for this instruction is South Dakota Criminal Pattern Jury Instruction 1–14–3 (formerly 1–16–2); the trial court deleted the optional references to a confession.

---

In *Dixon,* this court rejected the rule of law advocated by Samantha and opted to continue with its long held "abuse of discretion" standard of review. Samantha requests that we reverse this holding and adopt the above standard. After a review of our case law and authorities of other jurisdictions, we see no need to do so.

4. Samantha argues that the jury's acquittal of her on the first degree burglary charge of September 18, 1987, destroys the state's claim of a common scheme. This ignores the fact that the trial court must make its decision to sever based on the record before it prior to trial and not after the verdict is in.

Samantha claims that this instruction inaccurately defines admission and there was a lack of evidentiary support in the record to justify its inclusion in the trial court's instructions.

This instruction received this court's approval in *State v. Dokken*, 385 N.W.2d 493 (S.D.1986). In the case now before us, the trial court did not attempt to instruct on confessions as well as admissions, thus avoiding the distinction required by *Dokken* when the subject of confessions is also to be considered by the jury.

Samantha maintains that this instruction is in conflict with this court's recent decision of *State v. Stuck*, 434 N.W.2d 43 (S.D. 1988). In *Stuck*, the issue of what constitutes an admission arose:

"An admission is not limited to words, but may also include the demeanor, conduct and acts of the person charged with a crime. Further, a criminal admission is 'avowal of a fact or of circumstances from which guilt may be inferred....' Admissions are 'the words or acts of a party-opponent, or of his predecessor or representative, offered as evidence against him.' (citations omitted).

*Id.* at 54. We find the above definition to be consistent with the instruction of the trial court.

Samantha also maintains that the instruction is defective since an admission may be made only to a law enforcement officer and not to a third person. In *Stuck* and *State v. Swallow*, 405 N.W.2d 29 (S.D. 1987), the admission was made to a person who was not a law enforcement official nor acting under request of law enforcement.

Finally, Samantha maintains that there is no evidence in the record that can be interpreted as an admission, and therefore, it is prejudicial error to include this instruction. A review of the evidence shows that Samantha made the following statements which the jury could have found to be admissions:

1. Statements to Antoine while going to Mitchell about intending to get a spare key made to get into Andrew's apartment.

2. Statement to Antoine that she had taken the key to Andrew's apartment from her father, Earl, who had a key.

3. Statement to Westhoff that "they were going to do something drastic" and if anyone asked him, he should state that Samantha and Jaeb were at a party all evening.

4. Statement after the first burglary attempt on September 18 that they couldn't find "it" but were going to try again.

5. Statement about Andrew, "He's got to go. He seen us."

6. Statements convincing Jaeb that Andrew must be killed.

7. Samantha's discussion with Jaeb overheard by Antoine on what weapon should be used to kill Andrew.[5]

Thus, the trial court did not err in giving the above instruction to the jury.

## ISSUE III

DID THE TRIAL COURT ERR IN DENYING SAMANTHA'S MOTION FOR JUDGMENT OF ACQUITTAL AND MOTION FOR NEW TRIAL?

In *State v. Dirk*, 364 N.W.2d 117 (S.D.1985), this court held that the standard

5. Nearly all of the statements made by Samantha were spoken before the commission of the crime they refer to. Because the trial court instructed the jury on admissions rather than confessions, the time of the making of the statement in comparison to the time of the crime becomes unimportant.

In *Stuck, supra*, we held that the defendant's statement, "I'll tell you what I'm going to do. I'm going to cut you," was an admission. 434 N.W.2d at 54. *See also State v. Detloff*, 201 Iowa 159, 205 N.W. 534 (1925); *State v. Barber*, 179 N.W. 798 (Wis.1920).

In contrast, this court held in *Dokken, supra*, that "[a] confession is an admission of guilt by a party *charged with a crime*. [emphasis added]. It is a special kind of admission. *Every confession is an admission but not every admission is a confession.*" 385 N.W.2d at 504 *quoting State v. Callaghan*, 81 N.J.Super. 518, 196 A.2d 245, 248 (1963). One could not confess to a crime that was not in existence at the time the statement was made.

of review in passing on the propriety of a denial of a motion for judgment of acquittal at the close of the state's case is whether the state has made a prima facie case from which the jury could reasonably find the defendant guilty. *See also State v. Bult*, 351 N.W.2d 731 (S.D.1984).

We recently held in *State v. Sitting Crow*, 428 N.W.2d 268 (S.D.1988):

In determining the sufficiency of the evidence on appeal, the question is whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt. In making that determination, the Court will accept that evidence, and the most favorable inferences fairly drawn therefrom, which will support the verdict. This determination ' "may depend upon the difference between pure speculation and legitimate inference from proven facts." ' (citations omitted).

*Id.* at 270.

■ Samantha maintains that a more heightened scrutiny is required because she was convicted solely upon circumstantial evidence. However, this court has held that circumstantial evidence may be equal in value to and sometimes even more reliable than direct evidence. *State v. Best*, 232 N.W.2d 447 (S.D.1975). The state may prove all elements of a crime through the use of circumstantial evidence. *Bult, supra*. The use of circumstantial evidence is governed by *State v. Esslinger*, 357 N.W. 2d 525, 530–31 (S.D.1984):

The established rule in this state is that to warrant conviction upon circumstantial evidence alone, such facts and circumstances must be shown as are consistent with each other and with guilt of the party charged, and such as cannot by any reasonable theory be true and the party charged be innocent. This rule does not mean the evidence must be such as to exclude every possible hypothesis of innocence. Rather, it requires only the exclusion of reasonable hypothesis of innocence. (citations omitted).

*See also State v. Ashker*, 412 N.W.2d 97 (S.D.1987).

■ When reviewing a motion for new trial based on insufficient circumstantial evidence, this court will not substitute its judgment for that of the jury or trial court where the evidence is conflicting, if one of the conflicting inferences reasonably tends to prove guilt and fairly warrants a conviction. *State v. Rough Surface*, 440 N.W.2d 746 (S.D.1989).

The question then remains, as in any case, in determining sufficiency of the evidence on appeal, is there evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt?

■ Samantha's chief attack on the sufficiency of the evidence is upon Andrew's identification of Jaeb. It is uncontroverted that he never actually saw Samantha during these crimes. Although 88 years old at the time of the commission of the offenses, he had two good opportunities to view Jaeb on September 7 and another opportunity to view her during the assault on September 19. He readily picked her out of a picture line-up, a live line-up and identified her no less than six times at trial.

Samantha questions the reliability of Andrew's identification of Jaeb on the ground that Andrew described Jaeb as "white." This argument was analyzed and rejected in *State v. Jaeb, supra*.

Samantha further argues that there is insufficient evidence to show she participated in the attack on Andrew with intent to kill him. The evidence shows that Samantha and Jaeb agreed that he must be killed and settled on a tire iron as the weapon of choice. Prior to the attack, Samantha sought to get Westhoff to lie for her to create an alibi. Andrew was hit in the head nine or ten times with the tire iron. His doctor stated that any one of these blows could have killed him. In addition, he could have bled to death in his apartment had he not been able to awaken his neighbor to summon help.

It is not within the province of this appellate court to disturb reasonable inferences made by the jury. This court will not invade the jury determinations as to what doubt was or was not created in its collec-

tive mind. *State v. Miskimins*, 435 N.W. 2d 217 (S.D.1989). The circumstantial evidence as to Samantha's guilt is overwhelming. There is more than sufficient evidence in the record to justify Samantha's conviction on Counts I, III and IV.

## CONCLUSION

The judgment of conviction is affirmed.

WUEST, C.J., and MORGAN, HENDERSON and MILLER, JJ., concur.

GILBERTSON, Circuit Judge, for SABERS, J., disqualified.