**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Michael JENNER, Defendant and Appellant.**

**No. 15780.**

Supreme Court of South Dakota.

Argued Sept. 1, 1988.

Decided Dec. 28, 1988.

Craig M. Eichstadt, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Roger A. Tellinghuisen, Atty. Gen., Pierre, on brief.

Christopher Baumann, Spearfish, for defendant and appellant.

WUEST, Chief Justice.

Defendant, Michael Jenner, appeals his conviction of murder in the first degree, conspiracy to commit murder in the first degree, and accessory after the fact to murder. We affirm.

On the afternoon of August 6, 1986, the body of Jackie Sjong (Sjong) was discovered under a bridge near the KOA campground north of Spearfish, South Dakota. An autopsy revealed that Sjong had been shot twice above the right ear and twice in the chest. Powder burns indicated that the wounds to Sjong's head had been inflicted from an estimated distance of one foot. The chest wounds appeared to have been caused by shots fired from approximately two to three feet away. Either set of wounds would have been independently fatal.

Two bullets, one found at the scene and the other recovered from Sjong's body, indicated that the shots fired into Sjong's head came from a .38 caliber weapon. This weapon was never recovered. Two .45 caliber shell casings were also discovered near Sjong's body, but no .45 caliber bullets were found. The diameter of these casings, however, corresponded to that of Sjong's chest wounds. Subsequent ballistics tests determined that these casings had been fired from a weapon in defendant's possession.

The record indicates that Sjong's death apparently stemmed from his association with members of the Vagos, an outlaw motorcycle club of which defendant was a chapter president.[1] Sjong was a prospective member of the club.

In late December, 1984, Sjong and another Vagos member, Ricky Fenstermaker (Fenstermaker) were driving down a California highway when a hitchhiker "gave them the finger." Fenstermaker immediately confronted the hitchhiker and fatally stabbed him. Sjong witnessed these acts and subsequently informed the police of Fenstermaker's involvement in the slaying. A warrant was issued for Fenstermaker's arrest, but he managed to elude the police for over one and one-half years until his arrest on July 22, 1986.[2]

While he was a fugitive, Fenstermaker attended the funeral of a fellow Vago in the summer of 1985. Other Vagos members knew he was "on the run" and it was at this funeral that one of them, J. Richard Elliott (Elliott), asked him if there was anything that could be done to "take care of the witnesses." To this inquiry, Fenstermaker replied, "I don't think so."

Prior to Fenstermaker's arrest, he also spoke to defendant and Leonard Barella (Barella), the international president of the Vagos, about the hitchhiker's death and Sjong's involvement in the killing. After

Fenstermaker was arrested, he telephoned Barella and told him that he wanted Sjong "picked up." Barella informed Fenstermaker that they already had "custody" of Sjong and that he should contact defendant. Fenstermaker then telephoned defendant and inquired about what was being done with Sjong. Defendant replied, "Don't worry about it. I'll take care of it," and instructed Fenstermaker not to contact any other club members until they had first contacted him.

Shortly after Fenstermaker's arrest, the Vagos travelled to South Dakota for the annual Black Hills Motorcycle Rally. Defendant, Sjong and four other members of the Vagos from California stopped in Wyoming where they met other club members from Arizona, Texas and Wyoming. Among the members travelling from Texas was Elliott. On August 5, 1986, thirteen Vagos, including defendant, Elliott and Sjong, proceeded from Wyoming to the KOA campground north of Spearfish. They arrived sometime during the late evening of that same day.

In the early morning hours of August 6, 1986, defendant, Elliott and Sjong left the campground in defendant's van. Elliott drove the van approximately one thousand feet and stopped. Defendant and Sjong then got out of the van and walked down an embankment to talk. After ten to twenty minutes, Elliott heard two shots. He then went down the embankment to look for defendant and Sjong. Elliott took with him a .38 caliber revolver he brought from Texas. He found Sjong's body under a bridge. Defendant came up behind Elliott and instructed him to also shoot Sjong. It was a Vago policy to involve another person in the commission of a crime to prevent that person from informing the authorities. Either defendant or Elliott then fired two

1. The members of the Vagos primarily reside in the southwestern United States. Defendant was president of the Los Angeles chapter of the Vagos.

2. Fenstermaker pleaded guilty to voluntary manslaughter for killing the hitchhiker. A California court sentenced him to twelve years imprisonment in that state's penitentiary system. In exchange for Fenstermaker's testimony against defendant and Elliott at trial, the Lawrence County State's Attorney granted him immunity from prosecution in South Dakota for any involvement in Sjong's death.

more shots into Sjong's head.[3]

When defendant and Elliott returned to the campground, they were questioned as to Sjong's whereabouts by another Vagos member, Bill Cross (Cross). Defendant informed Cross that Sjong had stolen a motorcycle and was returning to California.

Later that day, the Vagos prepared to go into Sturgis. Most of the members carried weapons with them in the event an altercation arose with another motorcycle club. Before they left, Elliott asked Cross to retrieve his gun from a trash dumpster. Cross, however, was unable to find Elliott's gun.[4] He later overheard Elliott tell Barella that the "throw away piece" had been abandoned.[5]

A Lawrence County Deputy Sheriff visited the Vagos camp the day after Sjong's body had been discovered. He inquired of defendant whether anyone was missing from the group. Defendant stated that no one was missing. The deputy sheriff then showed defendant drawings representing tattoos found on Sjong's body and asked him if he recognized them. Defendant again gave a negative response.

After the deputy sheriff left, the Vagos broke camp and departed for Casper, Wyoming. Defendant stopped en route to make several telephone calls. During one of these telephone conversations, Cross overheard defendant state, "The witness has been taken care of and we have a few loose ends to tie up." Because Elliott and another Vagos member confronted Cross and questioned his loyalty to the Vagos and individual members on the previous eve-

ning, he feared that he was a "loose end."[6] Cross reported Sjong's disappearance to the police when the Vagos reached Casper. Defendant and Elliott were arrested shortly thereafter.

On October 10, 1986, defendant and Elliott were indicted for murder in the first degree and conspiracy to commit murder in the first degree. Defendant was individually indicted for being an accessory after the fact to murder. Prior to trial, defendant filed a motion to sever his case from Elliott's. Defendant asserted that his and Elliott's defenses were antagonistic. The trial court denied the motion.

Trial commenced on March 30, 1987, during which defendant renewed his motion for severance. The motion was denied. At trial, both defendant and Elliott denied shooting Sjong and each implicated the other. The jury, however, convicted both of the crimes charged against them. Defendant was sentenced to life imprisonment without parole in the South Dakota State Penitentiary on the first degree murder and conspiracy to commit first degree murder convictions, and five years in the South Dakota State Penitentiary on the conviction of accessory to murder.

Defendant now appeals his conviction, asserting through counsel and pro se several claims. In his pro se brief, defendant contends that (1) the trial court erred in allowing hearsay declarations of co-conspirators; (2) the trial court erred in its instructions to the jury; (3) the trial court abused its discretion in instituting trial security measures, allowing the introduction of Fen-

---

**3.** Elliott claims that he was unable to shoot Sjong as instructed and that defendant then grabbed the gun from Elliott's hand and fired two shots into Sjong's head. Tests conducted on Elliott's clothes, however, are inconsistent with this story. The tests revealed extensive blood spatters on Elliott's clothes in the same blood type as Sjong's. At the trial, a pathologist testified that the person who shot Sjong in the head was more likely to have been spattered with blood than the person who shot Sjong in the chest. Defendant's clothes had little, if any, blood spattering.

**4.** Elliott later took Cross' .38 caliber gun. It was this gun that Elliott lost in a Sturgis bar during a brawl. At the trial, this weapon was admitted

into evidence. Expert testimony proved that this gun could not have fired the bullets that inflicted the wounds to Sjong's head.

**5.** Elliott also asked Cross to get him a shovel to bury the body. Cross believed Elliott was confused or incoherent from liquor and amphetamines and disregarded the request.

**6.** Cross testified that Elliott asked him the following question: "If a club member did something against the law, would you snitch on him or would you go to jail?" Fearing that his life would be in danger if he answered "incorrectly," Cross replied, "Yes, I would rather go to jail than snitch on a brother." Trial Tr. at 871–72.

stermaker's guilty plea without objection, allowing introduction of a .38 caliber pistol, permitting what defendant has termed "prosecutorial misstatements," allowing the prosecutor's "badgering" or questioning of Elliott, and allowing evidence of defendant's phone call from Wyoming; (4) the state's attorney was guilty of prosecutorial misconduct with regard to Fenstermaker's testimony; and (5) the conspiracy charge was defective. We hold that these assertions lack merit and affirm them on the basis of settled law, no abuse of discretion, and clearly sufficient evidence to support the determinations of the trial court. We separately address defendant's contentions raised by counsel that (1) the trial court abused its discretion in denying motions for a separate trial; (2) defendant was entitled to entry of a judgment of acquittal due to insufficiency of the evidence; and (3) the trial court abused its discretion in admitting certain evidence against defendant.

We first address defendant's contention that the trial court abused its discretion in refusing to sever the trial. Defendant contends he was prejudiced at trial because of Elliott's interest in inculpating him for the slaying of Sjong. Defendant claims he was asleep at the time of Sjong's death and when he awoke, Elliott and another Vagos member were driving into the campground with his van and Sjong was missing. Elliott testified that although he was present at the scene of Sjong's death, he did not shoot Sjong. Elliott, however, refused to name at trial the person who ordered him to shoot Sjong and then allegedly shot Sjong twice in the head when he was unwilling to comply.[7] Only after the prosecution had elicited testimony from Elliott eliminating the other Vagos members was the jury able to ascertain that it was defendant who accompanied Sjong down the embankment.

The well-settled rule in South Dakota is that persons indicted jointly for the commission of an offense should be tried together. *State v. Andrews,* 393 N.W.2d 76,

78 (S.D.1986). As Justice Henderson recently stated for this court in *State v. Jaques,* 428 N.W.2d 260, 267 (S.D.1988), the granting of severance "is not a matter of right, but rests in the discretion of the trial court, to be exercised in the interests of justice." *See also* SDCL 23A–11–2; *State v. Sitting Crow,* 428 N.W.2d 268 (S.D. 1988); *Andrews,* 393 N.W.2d at 78. The trial court's refusal to grant a severance motion will be reversed on appeal only if the defendant demonstrates an abuse of discretion. *Andrews,* 393 N.W.2d at 79; *State v. Maves,* 358 N.W.2d 805, 809 (S.D. 1984). The defendant establishes an abuse of discretion by showing *substantial* prejudice which constitutes a denial of a fair trial. *United States v. Carpentier,* 689 F.2d 21, 27 (2d Cir.1982), *cert. denied,* 459 U.S. 1108, 103 S.Ct. 735, 74 L.Ed.2d 957 (1983); *State v. Weddell,* 410 N.W.2d 553, 555 (S.D.1987); *State v. Honomichl,* 410 N.W.2d 544, 546 (S.D.1987); *Andrews,* 393 S.D. at 79; *Maves,* 358 N.W.2d at 809. "A certain amount of prejudice to a defendant is regarded as acceptable given the judicial economies that result from joinder." *Carpentier,* 689 F.2d at 27.

To cause the type of prejudice that prevents co-defendants from obtaining a fair trial, the defenses must be more than merely antagonistic. They must conflict to the point of being irreconcilable and mutually exclusive so that acceptance of one defendant's defense will preclude the acquittal of the other defendant. *Weddell,* 410 N.W.2d at 555; *Honomichl,* 410 N.W. 2d at 546. *See also United States v. Bruun,* 809 F.2d 397 (7th Cir.1987); *United States v. Walker,* 720 F.2d 1527 (11th Cir. 1983); *United States v. Arruda,* 715 F.2d 671 (1st Cir.1983); *United States v. Shively,* 715 F.2d 260 (7th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984); *United States v. Graziano,* 710 F.2d 691 (11th Cir.1983); *United States v. Bovain,* 708 F.2d 606 (11th Cir. 1983), *cert. denied,* 464 U.S. 898, 104 S.Ct. 251, 78 L.Ed.2d 238 and *cert. denied,* 464 U.S. 997, 104 S.Ct. 497, 78 L.Ed.2d 690 and

---

**7.** Elliott was unwilling to name the person who accompanied him and Sjong in the van because he feared retributive action by the Vagos against him or his family.

*cert. denied,* 464 U.S. 1018, 104 S.Ct. 551, 78 L.Ed.2d 724 (1983); *United States v. Varella,* 692 F.2d 1352 (11th Cir.1982), *cert. denied,* 463 U.S. 1210, 103 S.Ct. 3542, 77 L.Ed.2d 1392 and *cert. denied,* 464 U.S. 838, 104 S.Ct. 127, 78 L.Ed.2d 124 (1983); *United States v. Berkowitz,* 662 F.2d 1127 (5th Cir.1981); *Sitting Crow,* 428 N.W.2d at 270; *Jaques,* 428 N.W.2d at 267. The fact that hostility may be present among co-defendants or one defendant desires to exculpate himself by inculpating another defendant does not necessarily mean that said co-defendants' defenses are irreconcilable and mutually exclusive. *Weddell,* 410 N.W.2d at 555; *Honomichl,* 410 N.W.2d at 546.

■ Applying these principles to the present case, we find that defendant failed to make the requisite showing that his defense and that of Elliott were so irreconcilable that severance was required. Although there was an apparent conflict between Elliott's testimony and defendant's position, this inconsistency, *by itself,* did not compel the jury to believe Elliott's story to the exclusion of defendant's and infer defendant's guilt. The sum of the evidence (i.e., the shell casings found by Sjong's body, the Wyoming phone call and defendant's close ties to Fenstermaker) was sufficient for the jury to find defendant guilty without having to infer it from Elliott's testimony. While there was no doubt some hostility and fingerpointing during the joint trial of defendant and Elliott, this alone is insufficient to justify granting severance. *See Bruun,* 809 F.2d at 407; *Arruda,* 715 F.2d at 679; *United States v. Harris,* 542 F.2d 1283 (7th Cir.1976); *United States v. Hutul,* 416 F.2d 607 (7th Cir.1969), *cert. denied,* 396 U.S. 1012, 90 S.Ct. 573, 24 L.Ed.2d 504 (1970). We cannot say that we are left with a definite and firm conviction that this joint trial denied defendant a fair trial. Accordingly, we hold that the trial court did not abuse its discretion in refusing to grant defendant's motion to sever.

Defendant's second argument is that the trial court erred in denying his motion for judgment of acquittal. Defendant claims the evidence was insufficient for the jury to find him guilty. We disagree.

In *State v. Weddell,* 410 N.W.2d 553, 555–56 (S.D.1987), we stated:

Our standard of review on denial of this motion is whether the State made out a prima facie case from which the jury could reasonably find the defendant guilty. Sufficiency of trial evidence rests on whether the evidence, if believed by the jury, is sufficient to find guilt beyond a reasonable doubt. In making such determination, this court will accept evidence and the most favorable inferences that can be fairly drawn from that evidence will support the guilty verdict. (Citations omitted).

*See also Sitting Crow,* 428 N.W.2d at 270; *Jaques,* 428 N.W.2d at 267. Simply stated, we will not set aside a verdict if the evidence supports a rational theory of guilt. *State v. Ashker,* 412 N.W.2d 97, 105 (S.D. 1987); *Andrews,* 393 N.W.2d at 80; *State v. Dale,* 360 N.W.2d 687, 690–91 (S.D.1985).

■ Although the case against the defendant rests substantially on circumstantial evidence, we believe it is sufficient to prove defendant's guilt on the charges of conspiracy to commit murder, murder and accessory to murder. In order to establish conspiracy, the state must prove that (1) there was an agreement between two or more persons to commit an unlawful act; (2) the defendant was a party to the agreement; and (3) an overt act was committed in furtherance of the agreement by one of the co-conspirators. *Bruun,* 809 F.2d at 410; *United States v. Noble,* 754 F.2d 1324, 1328 (7th Cir.1985). The agreement between the co-conspirators, which is the essence of a conspiracy, need not be formal or expressed. A tacit understanding may be sufficient to constitute a conspiratorial agreement. *United States v. Richmond,* 700 F.2d 1183, 1190 (8th Cir.1983). Moreover, because conspiracy by its very nature is often not susceptible to proof by direct evidence, the existence of an agreement may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the alleged co-conspirators that may be indicative of their concert-

ed action toward a common unlawful goal. *Id.* Once the existence of a conspiracy is shown, even slight evidence connecting a particular individual to a conspiracy may be sufficient to sustain a conspiracy conviction, and the state need not prove that the alleged co-conspirators had knowledge of every detail or phase of the conspiracy. *Id.* (*citing United States v. McCarty*, 611 F.2d 220, 222–23 (8th Cir.1979)).

A conspiracy does not terminate with the commission of the underlying overt act. It continues thereafter so as to include not only the substantive offense but also acts and declarations directed at concealing that offense. *State v. Waterbury*, 307 N.W.2d 45, 50 (Iowa 1981); *People v. Columbo*, 118 Ill.App.3d 882, 74 Ill. Dec. 304, 352, 455 N.E.2d 733, 781 (1983); *Commonwealth v. Bolden*, 268 Pa.Super. 431, 408 A.2d 864, 867 (1979). The reason for including these subsequent efforts at concealment is that such acts and declarations further the conspiracy by allowing the co-conspirators to escape punishment. *Columbo*, 74 Ill.Dec. at 352, 455 N.E.2d at 781.

In the present case, the trial court properly found from the evidence that a conspiracy existed between defendant and Elliott for the commission of murder and that the conspiracy extended to concealing their criminal acts. A close examination of the record indicates a close association between the Vagos, including defendant and Elliott, and the Vago policy of eliminating "snitches." Both defendant and Elliott spoke with Fenstermaker about "taking care of witnesses." Defendant and Elliott were linked to the weapons that caused Sjong's death, and there is evidence that both were present at the scene of Sjong's death and that Elliott participated in the shooting so that he would not "talk." There is also evidence of defendant's and Elliott's efforts to conceal Sjong's murder. Defendant attempted to conceal Sjong's whereabouts from fellow members and a Lawrence County Deputy Sheriff. Elliott discarded one of the murder weapons. We believe the sum of this evidence adequately supports a rational theory of guilt on

charges of conspiracy to commit murder as well as murder.

As to the accessory charge, SDCL 22-3-5 requires only that a defendant, with the "intent to hinder, delay or prevent the discovery, detection, [or] apprehension ... of another for the commission of a felony," rendered assistance to the other person. Defendant deceived a deputy sheriff as to his knowledge of Sjong's whereabouts and Elliott's involvement, thereby obstructing the deputy sheriff's investigation of Sjong's death. *See* SDCL 22-3-5(4). The jury chose to believe that the evidence was sufficient to prove guilt beyond a reasonable doubt and we will not set aside their verdict here.

Defendant's third contention is that the trial court abused its discretion in admitting certain evidence which was in the form of physical evidence and hearsay material. Defendant claims that photographs and testimony concerning Elliott's .38 caliber revolver and the bullets recovered from Sjong's body and the scene of his death would not have been admissible in defendant's trial had he been tried separately. Defendant also contends that statements made by Elliott to Cross concerning his gun and a shovel for burying Sjong's body were hearsay and inadmissible against defendant. The state argues that this evidence was admissible against defendant since it sets forth actions taken during the course and in furtherance of the conspiracy.

The physical evidence in question relates to Elliott's acts as a member of the conspiracy. Because each co-conspirator is liable for the acts of the other co-conspirators, the court did not abuse its discretion in admitting this evidence. *See State v. Reutter*, 374 N.W.2d 617 (S.D.1985).

Having already determined that the conspiracy in the present case included efforts to conceal Sjong's murder, we believe that Elliott's statements to Cross were made during the course and in furtherance of the conspiracy. Such statements are admissible under the co-conspirator exception to the hearsay rule. *See*

*State v. Smith,* 353 N.W.2d 338 (S.D.1984). Accordingly, the trial court did not abuse its discretion in admitting these statements either.

The conviction and sentence rendered by the trial court are affirmed.

MORGAN, SABERS and MILLER, JJ., concur.

HENDERSON, J., dissents.

HENDERSON, Justice (dissenting).

Thoughts, reasons, rationale, federal cases, treatises, law review articles, United States Constitutional provisions, South Dakota Constitutional provisions, applicable state statutes, Uniform Rules of Criminal Procedure, and American Bar Association Standards for Criminal Justice have all been cited by this writer in his continuing disagreement with the South Dakota Supreme Court's decisions on severance. Without therefore waxing into the details of these various authorities, suffice it to say that this writer has dissented on the issue of severance in such cases, *inter alia,* as *State v. Honomichl,* 410 N.W.2d 544, 550 (S.D.1987); *State v. Weddell,* 410 N.W.2d 553, 557 (S.D.1987); *State v. Maves,* 358 N.W.2d 805, 811 (S.D.1984); *State v. No Heart,* 353 N.W.2d 43, 49 (S.D. 1984); and *State v. Iron Shell,* 336 N.W.2d 372, 377 (S.D.1983). Based upon all of the authorities and writings, I dissent once again believing that the severance of defendants in a criminal trial should be the general rule rather than the exception. In South Dakota, for all practical purposes, we have abandoned the concept that there can be prejudicial joinder. For the author of the majority opinion to compare this case with *Sitting Crow* and *Jaques,* wherein I was the majority writer, is totally an academic wrong. In *Sitting Crow* and *Jaques,* neither codefendant denied participating in the crime of beating the victim to death; both claimed that it was justified. In the case before us, both parties are saying "I didn't do it, he did it." Quite a difference!

The contrast between the *Sitting Crow/Jaques* scenario and Jenner's predic-ament is obvious. Elliot's defense posited that he was present but was not a participant in Sjong's killing, which was carried out by Jenner. Jenner's defense, on the other hand, was that Jenner was not present at all, but his testimony implicated Elliot. Unlike *Sitting Crow/Jaques,* the defenses here are antagonistic and resulted in real prejudice. *See Jaques,* 428 N.W.2d at 267; *Sitting Crow,* 428 N.W.2d at 270. There can be no doubt that, without Elliot's testimony, a conviction against Jenner would have been far more difficult to obtain for the crimes of murder and conspiracy to commit murder. Evidence reflected that there was no blood on Jenner's clothing, or his fingerprints on any weapon, nor any witness that Jenner left the KOA campground with Sjong and returned without him. Elliot, on the other hand, had blood on his clothes, which was consistent with the back spray of blood from the high-velocity impact of a bullet striking a person, and of the same blood type as the victim, Sjong. Codefendant Elliot was the State's best witness against Jenner, making a fair trial impossible. *See United States v. Crawford,* 581 F.2d 489 (5th Cir. 1978). Where, "[l]ike the wretches in Dante's hell, they may become entangled and ultimately fuse together in the eyes of the jury.... [T]he trial judge abuses its discretion in failing to sever the trials of the co-defendants." *United States v. Romanello,* 726 F.2d 173, 174 (5th Cir.1984).

After the opening statements by all counsel (defense tables previously together), tables, defense counsel, and defendants separated. The war was on between the two defendants. Elliot (codefendant) became the State's best witness. Attorney Baumann, rather emotionally, told the Highest Court of this State, during argument, "We were prepared to defend against the State but not Elliot and his counsel." As determined by the *Crawford* Court, the defenses asserted by the codefendants were antagonistic, irreconcilable, as well as mutually exclusive.

In my *Weddell* dissent, 410 N.W.2d 559 nn. 6 & 7, I pointed out what constitutes "irreconcilable" and "antagonistic"; sure-

ly, the *Weddell* opinion expanded our language in *No Heart*, 353 N.W.2d at 47, to adopt a very tough rule set forth in *United States v. Boyd*, 610 F.2d 521, 526 (8th Cir.1979). As an appellate Justice, my job is not to affirm convictions by rote. I am not a chattel for the state, sitting in our state capitol, to affirm criminal convictions by automatic thought process. In *Weddell*, I went to great lengths to explain the duality of functions in an appellate court. First, we review the trial court's ruling for correctness, or at least within a range of error of law which appellate courts seemingly permit the first decision-maker. Secondly, we should involve ourselves in institutional review realizing that trial courts work independently in our state and have no self-regulating capacity to promote uniformity among the various decisions in the circuits. Legal principles, present in this Court, developed over a period of decades, must be recognized so that lawyers and trial judges can predict just how a judge is going to apply the power he has as a trial judge. Within the ambit of that duality, each and every defendant is guaranteed a fair trial. U.S. Const. amend. XIV, § 1; S.D. Const. art. VI, § 2. We cannot expect trials to be perfect, but they must be fair. *See Brown v. United States*, 411 U.S. 223, 231, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208, 215 (1973). Nor is it my job to jump into the jury box and decide factual questions, such as: Is Jenner guilty? That is up to the jury. But it is my job to see that criminal defendants have a fair trial. I would reverse these convictions and send this case back for a retrial where Jenner and his lawyer would not be sitting at the table with another accuser, namely Elliot, and a lawyer representing Elliot, the latter doing everything within his legal ability and power to try to pin the crime on Jenner. Prejudice occurred here by this joint trial. The jury could infer guilt quite rationally because of Elliot and his lawyer's advocacy on behalf of the State. What a position for a prosecutor to be in! He or she can sit in the trial chair and watch each defendant tear away at the other's defense, watch each defendant blame the other for the offense, and sit there—the recipient of rough and tumble advocacy both working in his/her favor. In *Weddell*, I referred to how an old ballplayer learns, early, and perhaps I should have said "young" ballplayer, that one must play fairly by a set of rules, and I mentioned that our court system can survive only by playing according to the rules to achieve fairness. So I will conclude my writing by stating that when the ball game begins, the score should be zero to zero. Here, the score was not zero to zero. The score was weighted in favor of the State before the ball game began. And that runs against the grain of an old ballplayer who has been elevated to the Highest Court of this State by its people on two occasions.