#23760-a-JKK

**2006 SD 94**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,        Plaintiff and Appellee,

v.

ALEMU TADELE BERHANU,        Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

HONORABLE GLEN A. SEVERSON
Judge

* * * *

LAWRENCE E. LONG
Attorney General

ANN C. MEYER
Assistant Attorney General        Attorneys for plaintiff
Pierre, South Dakota        and appellee.

SCOTT B. CARLSON        Attorney for defendant
Sioux Falls, South Dakota        and appellant.

* * * *

ARGUED ON OCTOBER 3, 2006

OPINION FILED **11/01/06**

#23760

KONENKAMP, Justice

[¶1.]     Defendant appeals his convictions for attempted first degree murder and two counts of aggravated assault. We affirm.

## Background

[¶2.]     Abraham Sandal was scheduled to work at Wal-Mart in Sioux Falls, South Dakota, at 11:00 p.m. on January 7, 2005. He decided to go to work around 10:00 p.m. that evening because he wanted an extra hour of work. After he arrived and parked his vehicle in the Wal-Mart parking lot, he began walking toward the store entrance. At the same time, defendant Alemu Berhanu, a fellow employee and former friend, sat in his parked car just a few spaces away from where Sandal had parked.

[¶3.]     As Sandal was walking toward the store, Berhanu pulled out of his parking space and drove toward Sandal. Berhanu accelerated and ran his vehicle into him. The impact of the collision caused Sandal's body to bounce off the front of Berhanu's car. Sandal rolled off and got caught underneath. Berhanu continued driving forward with Sandal still pinned underneath his car. He drove between two concrete-based poles used to designate handicap parking. The right side of his car grazed one pole, yet Berhanu continued to drive toward the front of the Wal-Mart store. He did not stop until he ran into a car occupied by George Zahn. Zahn was parked in front of the store waiting for his wife to return. The collision sandwiched Zahn's vehicle between Berhanu's car and the Wal-Mart store, thereby pinning Zahn inside his vehicle. Sandal was still trapped underneath Berhanu's car.

[¶4.]    Berhanu got out of his car and began to walk away. Moments later, a bystander who witnessed him driving over Sandal, stopped Berhanu and restrained him until law enforcement officers arrived. Thereafter, Berhanu was taken into custody and charged with (1) attempted first-degree murder of Sandal, (2) aggravated assault on Sandal, (3) aggravated assault with a dangerous weapon against Zahn, and (4) violation of a protection order.

[¶5.]    At the close of his jury trial, Berhanu moved the court for a judgment of acquittal, claiming that the evidence was insufficient to establish guilt for attempted murder and two counts of aggravated assault. The trial court denied Berhanu's motion, and the jury found him guilty of all four charges. He was sentenced to twenty-five years for attempted first-degree murder, fifteen years for the aggravated assault against Zahn, and one year for violating a protection order. The court did not impose a sentence for the aggravated assault on Sandal. The fifteen and twenty-five year sentences were ordered to be served consecutively, with the one year sentence to be served concurrently. The court also ordered restitution of $458,084.94 for Sandal's medical expenses.

[¶6.]    On appeal, Berhanu asserts that (1) there was insufficient evidence to support the jury's verdict beyond a reasonable doubt, and (2) his consecutive sentences amount to cruel and unusual punishment.

**Standard of Review**

[¶7.]    "In measuring evidentiary sufficiency, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"

#23760

State v. Disanto, 2004 SD 112, ¶14, 688 NW2d 201, 206 (quoting Jackson v. Virginia, 443 US 307, 319, 99 SCt 2781, 2789, 61 LEd2d 560 (1979)).  We will set aside a jury verdict only "where the evidence and all reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt."  State v. Hage, 532 NW2d 406, 410 (SD 1995) (citations omitted).

> The denial of a motion for judgment of acquittal presents a question of law, and thus our review is de novo.  *See* United States v. Staula, 80 F3d 596, 604 (1stCir 1996).  We must decide anew whether the evidence was sufficient to sustain a conviction.  SDCL 23A-23-1 (Rule 29(a)); State v. Guthrie, 2001 SD 61, ¶47, 627 NW2d 401, 420-21; *see also* 2 Steven Alan Childress & Martha S. Davis, *Federal Standards of Review* § 9.10 (3d ed 1999) (citing United States v. Scott, 437 US 82, 100 n13, 98 SCt 2187, 2198 n13, 57 LEd2d 65 (1978)).

*Disanto*, 2004 SD 112, ¶14, 688 NW2d at 206.  *See also* State v. Tofani, 2006 SD 63, ¶35, 719 NW2d 391, 399.  Whether a sentence is cruel and unusual in violation of our state and federal constitutions is a question of law reviewed de novo.  State v. Smiley, 2004 SD 119, ¶4, 689 NW2d 427, 429; State v. Bonner, 1998 SD 30, ¶17, 577 NW2d 575, 580.

## Analysis and Decision

[¶8.]        Berhanu argues that the State failed to produce sufficient evidence establishing each element of attempted first-degree murder.  He maintains that he did not intend to kill Sandal, but only meant to scare him.  Moreover, he claims that the State failed to present evidence establishing his state of mind, and therefore, did not prove beyond a reasonable doubt that he had a "premeditated design to effect the death" of Sandal.  In response, the State argues that at the very least Berhanu formed the intent to kill Sandal moments before he intentionally drove his

car over him.  This conclusion, the State contends, is supported by witness testimony and from the Wal-Mart surveillance video, showing that Berhanu intentionally drove into Sandal.  Moreover, the State asserts that because of Berhanu and Sandal's troubled relationship, there is further evidence to support an intent to kill Sandal.

[¶9.]        At trial, the State offered the testimony of Detective Bruce Millikan from the Sioux Falls Police Department.  Detective Millikan interviewed Berhanu after he was arrested.  The interview was recorded and the tape was entered into evidence at trial.  The tape was not played in open court, but Detective Millikan summarized for the jury the substance of the interview.[1]  He stated that Berhanu told him how he and Sandal had both immigrated to the United States from Ethiopia.  They had become friends about nine years ago when they worked together at John Morrell.  Sandal eventually left Morrell and began working at Wal-Mart, and Berhanu left to work in Omaha, Nebraska.  A short time later, however, Sandal convinced Berhanu to join him in Sioux Falls.  He had told Berhanu he would get him a job at Wal-Mart and that Berhanu could live with him.

[¶10.]        Berhanu told Detective Millikan that he came to Sioux Falls and began living with Sandal and working at Wal-Mart.  It was at some point after this move that Sandal and Berhanu's friendship deteriorated.  Detective Millikan testified that Berhanu had several different stories on why the two began having problems.

---

1.    The Detective testified that the video of the interview was difficult to understand because several times there would be more than one person talking at a time.  But, the detective took notes immediately after the

(continued . . .)

In one version, Berhanu said that Sandal wanted him to marry his sister who was still in Ethiopia so she could come to America. Then, because Berhanu did not want to, Sandal got upset. Berhanu also told the detective that Sandal started "intimidating him" by saying he got him the job at Wal-Mart, so he owed him a favor, and also threatened that he could get him fired.

[¶11.] Berhanu recalled for the detective two instances where he and Sandal fought publicly. The first was at a restaurant in Sioux Falls, where words were exchanged and drinks might have been thrown or spilled. The second was at a different restaurant, where the two again had a verbal disagreement. Berhanu explained that it was after this incident that Sandal sought and obtained a protection order against him. As a result of the protection order, Wal-Mart had to schedule Berhanu and Sandal for different work shifts. Berhanu told Detective Millikan how after the protection order was issued, Sandal began belittling him, calling him names at work, and telling coworkers and common friends that Berhanu was trying to kill him. This frustrated Berhanu, and Detective Millikan testified that "the overall attitude that I was picking up from my interview with Berhanu—[he was] frustrated with the courts, frustrate[d] with the lawyers, frustrated with [the] employer."

_____

(. . . continued)
interview. Jurors were allowed to view the interview videotape in the jury room if they so desired.

[¶12.]    Detective Millikan asked Berhanu about the evening of January 7, 2005, and why he ran his automobile into Sandal.  According to the detective, Berhanu had several versions of how and why it happened:

> One of the investigations was that Mr. Berhanu had gone to the store, [Wal-Mart], [to] check his schedule, his work schedule and that when he left the store, he was sitting in his car and saw that Abraham Sandal had come into the parking lot early, wasn't suppose [sic] to be there that early and that Abraham Sandal looked at Berhanu and then that Abraham Sandal approached Mr. Berhanu and yelled at him, you are not suppose [sic] to be here and the next version was that Abraham Sandal actually walked from Sandal's car to the [front] of Berhanu's car and said if you're going to hit me, go ahead and hit me, I'm not moving—called him on.
>
> Another version was that Mr. Berhanu didn't feel like he had any other alternative but to run him over because he was blocking the roadway and Berhanu didn't want to back up and go out a different way because he didn't want to hit somebody else in the parking lot or back into a car.  He then even went so far as to say this was the normal way he always drove out of the parking lot.

Detective Millikan had watched the Wal-Mart surveillance video tape, which recorded the entire incident in the parking lot, and knew that Sandal did not approach Berhanu or yell at him.  He showed Berhanu the tape and then confronted him on his inconsistent stories.  Berhanu's only response was, "If that's what you want to believe, that's what you must believe."

[¶13.]    The State also called Sandal, who explained the nature and history of Berhanu and Sandal's relationship.  Sandal told the jury that the problems started after he and his girlfriend decided to get married, moved out of the apartment, and purchased a home.  He disagreed with Berhanu's statement to Detective Millikan that their problems arose because he wanted Berhanu to marry his sister.  His

sister, Sandal explained, is married, has been for 22 years, and has seven children. Nonetheless, he agreed that their friendship did deteriorate and that he did request and obtain a protection order against Berhanu in December 2004.

[¶14.]     As for the evening of January 7, 2005, Sandal could not recall all the circumstances of the incident.  He testified that he remembered parking his car and walking toward the entrance of Wal-Mart, when a car "was screaming behind" him. He turned back and looked at the car, but did not recognize it, because "[w]ithin a short time he was—within a second, the car was jumped at me—jumped on top of my whole body. . . ."  Beyond that rendition, Sandal remembered nothing else. However, the State offered the testimony of several witnesses, who saw Berhanu run into Sandal.  Each witness explained how they saw Berhanu's vehicle accelerate and proceed directly toward Sandal, which led each of them to believe that Berhanu had deliberately driven into Sandal.

[¶15.]     First-degree murder is "perpetrated without authority of law and with a premeditated design to effect the death of the person killed or of any other human being. . . ."  SDCL 22-16-4.

> The term, *premeditated design to effect the death*, means an intention, purpose, or determination to kill or take the life of the person killed, distinctly formed and existing in the mind of the perpetrator before committing the act resulting in the death of the person killed.  A premeditated design to effect death sufficient to constitute murder *may be formed instantly before committing the act.*

SDCL 22-16-5 (emphasis added).  To be guilty of attempted first-degree murder, the State was required to prove beyond a reasonable doubt that Berhanu (1) had the specific intent to kill Sandal, (2) committed a direct act toward killing Sandal, and

(3) failed or was prevented or intercepted in the perpetration of the crime. *See Disanto*, 2004 SD 112, ¶15, 688 NW2d at 206 (citations omitted); State v. Scherr, 2002 SD 140, ¶15, 654 NW2d 220, 223; SDCL 22-4-1.

[¶16.] Based on our review of the evidence, we conclude that a rational trier of fact could have found the essential elements of attempted first-degree murder and aggravated assault against Sandal beyond a reasonable doubt. The evidence presented by the State and reasonable inferences to be drawn therefrom support the verdict. *See Hage*, 532 NW2d at 410; *see also* State v. Motzko, 2006 SD 13, ¶6, 710 NW2d 433, 436-37. Although there is no evidence that Berhanu made any advanced preparation to kill Sandal, "extensive planning and calculated deliberation need not be shown to establish premeditation." *See* State v. Owens, 2002 SD 42, ¶96, 643 NW2d 735, 758 (citations omitted). "The design to effect death need only exist for an instant before the commission of the crime." *Id.* (citations omitted). The video evidence reveals that Berhanu drove directly into Sandal and did not attempt to avoid him or stop after he hit him. Even though Sandal was pinned underneath, Berhanu continued driving forward. It is undisputed that Sandal suffered life-threatening injuries and could have been killed by Berhanu.

[¶17.] Berhanu next argues that there was insufficient evidence to prove beyond a reasonable doubt the charge of aggravated assault with a dangerous weapon against Zahn. He concedes that an automobile is a dangerous weapon. However, he argues that the State failed to prove that he attempted to cause, or knowingly caused bodily injury as required under SDCL 22-18-1.1(2). Instead, he

claims that the evidence merely established that he drove into Zahn's car because it was in his direct line of travel, not because he attempted to cause bodily injury to Zahn.

[¶18.] To be guilty of aggravated assault with a dangerous weapon under SDCL 22-18-1.1(2), the State must prove beyond a reasonable doubt that Berhanu attempted to cause, or knowingly caused bodily injury to Zahn, with a dangerous weapon. "Knowingly" in this statute denotes "acts or circumstances where the result is likely to occur." State v. Marshall, 495 NW2d 87, 89 (SD 1993), *overruled on other grounds*, State v. Giroux, 2004 SD 24, 676 NW2d 139. Berhanu was aware that by driving his vehicle toward the entrance of Wal-Mart, he placed in danger any person or vehicle parked in his line of travel. Moreover, it is clear that Berhanu never attempted to stop his vehicle before it hit Sandal or collided with Zahn's car. While he may not have *tried* to hit Zahn, his "act" of intentionally driving into Sandal, who was walking toward the entrance of the Wal-Mart store, and not stopping until he crashed into Zahn's vehicle, was a result that was "likely to occur." *See Marshall*, 495 NW2d at 89.

[¶19.] Berhanu's last argument that his sentence amounts to cruel and unusual punishment is without merit. *See* State v. Bonner, 1998 SD 30, ¶17, 577 NW2d 575, 580.

[¶20.] Affirmed.

[¶21.] GILBERTSON, Chief Justice, and SABERS, ZINTER, and MEIERHENRY, Justices, concur.