#24300-a-RWS

**2007 SD 79**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                              Plaintiff and Appellee,

  v.

TOD ALLEN WILKINSON,                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
BEADLE COUNTY, SOUTH DAKOTA

* * * *

HONORABLE DAVID R. GIENAPP
Judge

* * * *

LAWRENCE E. LONG
Attorney General

GARY CAMPBELL
Assistant Attorney General
Pierre, South Dakota                              Attorneys for plaintiff
                              and appellee.


CLIFTON KATZ
Katz Law Office
Huron, South Dakota                              Attorney for defendant
                              and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MAY 21, 2007

OPINION FILED **07/25/07**

#24300

SABERS, Justice.

[¶1.] Tod Allen Wilkinson was indicted on a variety of drug charges arising from a search of his residence pursuant to a search warrant. He moved to suppress the evidence alleging the search warrant was deficient, but the motion was denied. A jury found him guilty on all counts and he appealed. We affirm.

**FACTS**

[¶2.] Wilkinson's arrest arises out of an ongoing drug investigation in Huron, South Dakota. He lived with his girlfriend, Charlene Herding, who was one of the primary targets in the investigation. She came under police suspicion after police arrested Pattie Sumption for possession of methamphetamine. Sumption told police she received the drugs from "Cindy" at 1071 Kansas Ave. NE (1071 Kansas Ave.) in Huron and gave police Cindy's phone number. Police confirmed that Cindy Bordwell lived at that address and the phone number was Cindy's number.

[¶3.] Police also received information from a confidential source that Cindy and Angel Bordwell were distributing large quantities of methamphetamine and possibly cocaine in and around Huron. The police discovered Cindy had a criminal record that included an arrest for possession of amphetamines in Nebraska and Angel lived with Roy Reyna, who was subsequently arrested for possession of methamphetamines. When arrested, he admitted to being a distributor of methamphetamines.

[¶4.] During the investigation, the police observed Cindy and Angel Bordwell frequenting Herding's homes on a regular basis. They also observed several cars that Herding owns at Cindy Bordwell's 1071 Kansas Ave. residence.

-1-

Finally, a confidential source told a police officer that Herding was renting vehicles in Huron and traveling to Rapid City frequently, although the source indicated it was possible Herding was traveling to another location.

[¶5.]     At the time the search warrant was executed, Wilkinson and Herding were living at 1108 Dakota Ave. South (1108 Dakota Ave.) in Huron, but were previously living at 1055 Dakota Ave. South (1055 Dakota Ave.), also in Huron. They moved into the 1108 Dakota Ave. residence after the other home sustained fire damage. Despite their moving out, police continued to observe people coming and going from the residence at all hours of the day and night.

[¶6.]     One evening, the police observed a truck with a Nebraska license at both the 1108 Dakota Ave. and 1071 Kansas Ave. homes. Shortly after the truck left, the police observed a great deal of short and long-term traffic at the 1108 Dakota Ave. residence. Included in this traffic were three individuals that were identified and known to be involved with drugs.

[¶7.]     As part of this investigation, the police conducted trash pulls from the 1108 Dakota Ave. and 1071 Kansas Ave. residences. At the 1071 Kansas Ave. residence, the police found three scraps of paper that appeared to be "owe" sheets with the name "Char" on two of the sheets. The sheets also had the name Robin and the letter R, which the police were able to determine, stood for Roberta Johnson, residing at 120 Montana Ave. Southwest in Huron. The police conducted a trash pull on the Montana Ave. residence and found two plastic jeweler's bags which field-tested positive for methamphetamine.

[¶8.] A second trash pull was conducted at the 1071 Kansas Ave. address. This trash pull revealed a Wal-Mart sack containing the outer wrappings from four match boxes containing 50 matchbooks. The police found 199 of the matchbooks, which contained all of the matches, but none of the strike plates.[1] According to the police, Herding purchased a very large quantity of matches prior to July 4, 2005, from Manolis Grocery in Huron and was questioned at Coburn's Grocery in Huron regarding a recent purchase of a large quantity of matches on August 29, 2005.

[¶9.] The trash pull from the 1108 Dakota Ave. residence yielded a letter addressed to Charlene Herding at the 1055 Dakota Ave. address, a sheet of paper which read "4 oz," "5 oz," and "4830." In the application for a search warrant, the police indicated the street value for one ounce of methamphetamine is $1000-$1200 per ounce. The police also found a marijuana stem that field-tested positive for THC, a jeweler's bag that field-tested positive for methamphetamine and a broken, cylindrical glass tube. A second trash pull was conducted and this yielded mail addressed to Char Herding at the 1055 Dakota Ave. address, three plastic zip-lock bags with the corners removed, one package of Zig-Zag rolling papers and two short straws.

[¶10.] Special Agent James Legg of the Division of Criminal Investigation (DCI) applied for a search warrant, based on the above and more information included in an eleven-page affidavit in support of request for search warrant. Agent

---

1. The affidavit in support of the search warrant indicated that matchbook strike plates are used to obtain red phosphorus, which is an essential ingredient in some methamphetamine manufacturing processes.

Legg included information received from confidential informants. However, he did not indicate whether these informants were reliable or the source credible. At most, Agent Legg indicated that he "was able to corroborate" some "other information provided" by one confidential informant. Circuit Court Judge Erickson issued the search warrant, which, among other things, authorized a search of the homes at 1055 Dakota Ave. and 1108 Dakota Ave. and all persons and vehicles present or arriving at both homes for property that constituted evidence of a crime.

[¶11.]     When the police executed the search warrant, they found many drug-related items, including components of a methamphetamine lab. Specifically, at 1108 Dakota Ave. they found two safes containing drug-related contents including digital scales, a container containing .09 grams of powder containing methamphetamine, .003 ounces of marijuana, and a powder that looked like methamphetamine, but tested negative for controlled substances. The safe also contained documents addressed to Herding at the 1055 Dakota Ave. location. In addition, one safe contained glass pipes of the type typically used to smoke methamphetamine. These tested positive for methamphetamine residue. Baggies of marijuana, forceps, more pipes, water bongs and a brown vial typically used to conceal controlled substances were also found.

[¶12.]     At 1055 Dakota Ave., the police located a methamphetamine lab. During the search, Agent Legg asked Agent Jason Even of the DCI if he had seen the lab over at 1055 Dakota Ave. Wilkinson interjected that it was all his. The house had a scanner to monitor police channels and a camera, which allowed someone to monitor the front door from a television in the basement. In a blue

cooler, the police found soap bottles, a Gatorade bottle with red liquid inside, coffee filters, lye, two bottles of Heat, a spatula and funnel, other bottles containing unknown liquids and three bottles of cold medicine.[2]

[¶13.] In a closet near the blue cooler, police located a box which contained glassware and dishes that had white residue on them, a clear glass plate with a razor blade, a paint brush, two paint scrappers, one with white reside and one with a red substance on it, a spoon, syringe and a hypodermic needle. Two of the glass objects tested positive for amphetamine and methamphetamine. Some of the products tested positive for pseudoephedrine, which, according to the State, indicated they were used in the process of cooking methamphetamine. One of the agents testified that these products are typically used in the manufacturing of methamphetamine.

[¶14.] The police also found iodine, acetone, and napthol, which are chemicals commonly found in methamphetamine labs. Coffee grinders were found in a backpack and an agent testified these are used to grind pills so they dissolve more quickly. Also in this pack were a hypodermic needle, balloons, a funnel, and coffee filters. According to Agent Even all of the chemical components necessary for this type of methamphetamine lab were present the night of the raid except for the catalyst. He testified the catalyst needed is commonly acquired from match book

---

2.    One of the bottles of cold medicine was evidently the type from which methamphetamine cannot be manufactured. Sudafed PE does not contain pseudoephedrine or an ephedrine-based product which are commonly used to make methamphetamine. One bottle was the regular Sudafed and does contain pseudoephedrine or an ephedrine-based product.

strike plates and four grams of red phosphorus can be obtained from 500 strike plates, which allows for eight grams of methamphetamine to be produced.[3] Additionally, the lab would need an enclosed can or 2-liter pop bottle and hydrogen chloride or rock salt, which were not found at the residence.

[¶15.] Wilkinson was charged with possession of two ounces or less of marijuana, possession of controlled substance, manufacture of a controlled substance, and conspiracy to manufacture a controlled substance. He moved to suppress the evidence alleging the affidavit contained false information[4] and was insufficient to support probable cause. The motion was denied and Wilkinson and

---

3.  Bordwell possessed hundreds of matches and separated strike plates when she arrived at her house. A search of her home revealed 32.6 grams of methamphetamine powder. She testified that the matches were for her and Herding's use, although she claimed the matches were to be used to make fireworks.

4.  Agent Legg's affidavit averred that Parole Agent Harrison interviewed Micki Maresh regarding drug use by certain individuals. In the affidavit, Agent Legg claimed that Parole Agent Harrison informed him that Maresh knew Patti Sumption and Char Herding to associate with Cindy Bordwell. Maresh claimed that she did not know Cindy's last name. In its memorandum opinion, which was incorporated into the findings of fact, the trial court found Maresh did not know Bordwell's last name. The opinion states in relevant part:

    > The Court also finds that certain references to information received from Parole Agent Harrison in the affidavit were incorrect in certain respects, and in connection with those areas the [C]ourt finds that the testimony of Parole Agent Harrison and Micki Maresh to be more credible than the statements of the Agent in the affidavit. Specifically that it is believed by the Court that Micki Maresh did not know the last name of Cindy Bordwell and made reference only to Cindy.

    Memorandum Decision at 2, State v. Wilkinson, No. 06-35, (Beadle County July 7, 2006). *See infra* note 5.

Herding were tried by a jury.  The jury found both guilty of all four counts.

Wilkinson appeals and raises the following issues:

1.  Whether the affidavit in support of the request for a search warrant was sufficient to show probable cause.

2.  Whether certain items seized at 1055 Dakota Ave. should be suppressed on the ground they were not described with sufficient particularity within the search warrant.

3.  Whether sufficient evidence exists to convict Wilkinson of manufacturing a controlled substance and conspiracy to manufacture a controlled substance.

## STANDARD OF REVIEW

[¶16.]    In *State v. Babcock*, we explained the standard when reviewing the

sufficiency of a search warrant:

> We review challenges to the sufficiency of search warrants in a highly deferential manner, examining the totality of the circumstances to decide if there was at least a "substantial basis" for the issuing judge's finding of probable cause.  State v. Jackson, 2000 SD 113, ¶8, 616 NW2d 412, 416 (citing Illinois v. Gates, 462 US 213, 238-39, 103 SCt 2317, 2332, 76 LEd2d 527, 548 (1983) (citations omitted)).  "'A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.'" *Id.* ¶9 (quoting Massachusetts v. Upton, 466 US 727, 733, 104 SCt 2085, 2088, 80 LEd2d 721, 727 (1984)).  Our review of the issuing court's decision to grant the search warrant is done independently of the conclusion reached by the suppression court.  *Id.* ¶8.

2006 SD 59, ¶11, 718 NW2d 624, 628.  All reasonable inferences that can be drawn

will be construed "in support of the issuing court's determination of probable cause

to support the warrant."  State v. Helland, 2005 SD 121, ¶17, 707 NW2d 262, 269.

**[¶17.]**     **1.**     **Whether the affidavit in support of the request for a search warrant was sufficient to show probable cause.**

**[¶18.]**     Wilkinson claims the affidavit in support of the search warrant was deficient because the agent did not state that the confidential informants were reliable or that their information was credible. He also claims Agent Legg included false information in the affidavit. As a result of these deficiencies, Wilkinson argues the search warrant was not supported by probable cause and should not have been issued. He claims the evidence was illegally obtained and should have been suppressed.

**[¶19.]**     In reviewing the affidavit, we note that the affidavit does not include a statement regarding the credibility or reliability of the confidential informants. While including statements regarding the credibility and reliability of confidential informants may be helpful in determining probable cause, the exclusion of statements does not make a warrant per se invalid. *See* Illinois v. Gates, 462 US 213, 230-31, 103 SCt 2317, 2328, 76 LEd2d 527 (1983); State v. Jackson, 2000 SD 113, ¶9, 616 NW2d 412, 416. Instead, we look at the totality of the circumstances to determine whether the issuing court had a substantial basis to conclude probable cause existed. *Gates*, 462 US at 230-31, 103 SCt at 2328.[5] Here, the totality of the

---

5.     The Minnesota Court of Appeals has noted:

> When determining whether a confidential informant's tip provided officers with probable cause to arrest or search, we consider the totality of the circumstances, including the confidential informant's basis of knowledge, veracity, and reliability. State v. Ward, 580 NW2d 67, 71 (MinnCtApp 1998); *see* Illinois v. Gates, 462 US 213, 238, 103 SCt 2317, 2332 (1983) (adopting totality-of-the-circumstances approach to probable-cause determinations and abandoning previous approach that

(continued . . .)

circumstances demonstrates the affidavit contains sufficient evidence, independent of the confidential informant statements, to support the issuing court's determination of probable cause.[6]

[¶20.]    Probable cause to issue a search warrant need not rise to the level of a prima facie case. State v. Helland, 2005 SD 121, ¶16, 707 NW2d 262, 269 (additional citation omitted). "The standard of probable cause for the issuance of a search warrant is *a showing of probability of* criminal activity." *Id.* (citing State v. Gerber, 241 NW2d 720 (SD 1976); State v. Haron, 88 SD 397, 220 NW2d 829 (1974)). In this case, the totality of the circumstances indicates a judge could conclude it was more likely than not that the evidence would be found at the residence and there was a substantial basis for the issuing court's determination of probable cause.

_____

(. . . continued)

> required a showing of both basis of knowledge and veracity of confidential informant or reliability of information). In doing so, we do not consider the basis of knowledge, veracity, and reliability independently. *Gates*, 462 US at 233, 103 SCt at 2329. Rather, "a deficiency in one may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.*

> State v. Mueller, 2007 WL 1120572, at *3 (MinnCtApp April 17, 2007) (unpublished).

6.    In our review of the affidavit, we do not consider the false information contained in the affidavit. Because consideration of this information is not necessary to the probable cause determination, we do not reach the question whether it was made intentionally. *See* United States v. Ward, 703 F2d 1058, 1060 (8thCir 1983) (citing Franks v. Deleware, 438 US 154, 156, 98 SCt 2674, 2676-77, 57 LEd2d 667 (1978)).

[¶21.] Looking at the totality of the circumstances, the affidavit contained substantial evidence supporting probable cause. This is not a bare-bones affidavit that states only speculation. The affidavit contains numerous police observations including traffic flow indicating drug activity, frequent visits from individuals with known drug involvement, massive match book purchases, Herding's vehicles at Bordwell's residence, criminal histories and evidence from four trash pulls. These trash pulls yielded evidence of drug activities ranging from "owe sheets" to items with methamphetamine residue. Considering the totality of the circumstances, examination of the affidavit indicates a substantial basis for the issuing court's determination of probable cause.

[¶22.] Wilkinson also argues the warrant was improperly granted because the information in the affidavit was stale. He claims the information, except for the trash pull conducted three days before the affidavit was prepared, was obtained two weeks before the search. He argues that the Legislature enacted a statute that indicates probable cause may dissipate if the search is not conducted within a reasonable amount of time.

[¶23.] SDCL 23A-35-4[7] requires a search warrant to be executed within ten days of being issued. This statute guarantees that too much time does not pass, thus increasing the chance probable cause could dissipate, before police serve a

---

7. The statute provides in relevant part that "[t]he warrant shall be directed to a law enforcement officer. It shall command the officer to search, within a specified period of time not to exceed ten days, the person or place named for the property specified." SDCL 23A-35-4.

warrant. As the State argues, the statute does not restrict the age of information used to support the issuance of a warrant.

[¶24.]    We noted in *State v. Roth* that drug activities are ordinarily a regenerating and continuous activity, which occur over a protracted time. 269 NW2d 808, 812-13 (SD 1978) (additional citation omitted). The police use information gathered during the course of an investigation, which sometimes covers an extended period of time. "The vitality of probable cause" is not calculated solely by the length of time between the evidence and issuance of a warrant. *Id.* at 813 (quoting United States v. Johnson, 461 F2d 285, 287 (10thCir 1972)). Where criminal activity is continuing in nature, the information learned at the beginning of the investigation can be used in addition to the information learned toward the end of the investigation. *See* State v. Weiker, 342 NW2d 7, 10 (SD 1983) (citing *Roth*, 269 NW2d at 812).

[¶25.]    The affidavit contained sufficient evidence to support the issuing court's finding of probable cause. Therefore, we affirm.

[¶26.]    **2.    Whether certain items seized at 1055 Dakota Ave. should be suppressed on the ground they were not described with sufficient particularity within the search warrant.**

[¶27.]    Wilkinson argues that some items seized were "not inherently illegal" and were not listed with particularity in the search warrant. Specifically, he claims items such as the coffee pot and grinder, napthol, acetone, cold medicine, lye, soap bottles, paint scrappers and other items are not illegal to own and were not mentioned within the warrant as potential items to be seized. He argues that the officers suspected methamphetamine manufacturing and should have identified

items that could potentially be used in the manufacturing process. According to

Wilkinson, failure to list these items violates the Fourth Amendment's particularity

requirement.

[¶28.]     The search warrant authorized seizure of "[m]arijuana, controlled

substances, records, scales, scanners, *drug paraphernalia* and other obvious drug

related items used to introduce controlled substances or marijuana into the human

body." (Emphasis added). Drug paraphernalia is:

> any equipment, products, and materials of any kind which are
> primarily used, intended for use, or designed for use by the
> person in possession of them, in . . . manufacturing,
> compounding, converting, producing, processing, preparing,
> testing, analyzing, packaging, repackaging, storing, containing,
> concealing, injecting, ingesting, inhaling, or otherwise
> introducing into the human body any controlled substance or
> marijuana in violation of the provisions of this chapter.

SDCL 22-42A-1. Furthermore, the Legislature has provided factors that indicate

whether an object is drug paraphernalia. These factors include:

> . . .
> (2) The proximity of the object, in time and space, to a
> direct violation of this article;
>
> (3) The proximity of the object to controlled substances or
> marijuana;
>
> (4) The existence of any residue of controlled substances
> or marijuana on the object; . . . and . . .
>
> (13) Expert testimony concerning its use.

SDCL 22-42A-2.

[¶29.]     Under the statutes, the items seized qualified as drug paraphernalia.

Most of the items were found in one centralized location, the blue cooler. Other

items were found together in the backpack. It was not as if the officer found a coffee

grinder and filters in the cupboard. These items were found in a backpack with other items indicating drug use and/or manufacturing. Some of the items had methamphetamine residue on them. The agents testified the items were ones commonly used in manufacturing drugs. The proximity to drugs and other items used to manufacture drugs, along with the residue and testimony these items are commonly used in the manufacturing process indicates these items are drug paraphernalia. The trial court did not err in denying the suppression motion as these items were named with sufficient particularity in the warrant.

[¶30.]      **3.**      **Whether sufficient evidence exists to convict Wilkinson of manufacturing a controlled substance and conspiracy to manufacture a controlled substance.**

[¶31.]      Wilkinson's final argument is that there is insufficient evidence to support the jury verdict on the manufacturing and conspiracy to manufacture a controlled substance. He claims his motion for a directed verdict should have been granted. We review a denial of a motion for judgment of acquittal de novo. State v. Tofani, 2006 SD 63, ¶35, 719 NW2d 391, 400. We examine whether the jury had sufficient evidence to reasonably find defendant guilty of the manufacturing and conspiracy charges. *See id.*

[¶32.]      There was evidence the operation attempted to and did produce methamphetamine. There was testimony about residue on several items that were commonly used in the manufacturing process. Methamphetamine was found, as was some powder that resembled methamphetamine but did not test positive for methamphetamine. Agent Even testified this was most likely a failed attempt at making methamphetamine. There were several chemicals seized that are used in

the manufacturing process. Given this evidence, the jury could reasonably find Wilkinson guilty of manufacturing a controlled substance.

[¶33.] Wilkinson argues that there is no evidence of a conspiracy to manufacture methamphetamine. He argues that the indictment provided that the conspiracy occurred on or about January 24, 2006, and the conspiracy, if any, ended when he was arrested on January 23, 2006. Therefore, he claims the jury could not find him guilty of conspiracy on the date provided in the indictment because he was already arrested. Additionally, Wilkinson claims the State must prove the conspiracy occurred during a specific time frame.

[¶34.] First, there was ample evidence of a conspiracy. In order to show a conspiracy, the State must establish that "(1) there was an agreement between two or more persons to commit an unlawful act; (2) the defendant was a party to the agreement; and (3) an overt act was committed in furtherance of the agreement by one of the co-conspirators." State v. Jenner, 434 NW2d 76, 81 (SD 1988) (additional citation omitted). The agreement need not be formal or express as an implied understanding may suffice. *Id*. "[T]he existence of an agreement may be inferred from all the surrounding facts and circumstances, including the acts and declarations of the alleged co-conspirators that may be indicative of their concerted action toward a common unlawful goal." *Id*. at 81-82.

[¶35.] Viewing the evidence in the light most favorable to the verdict demonstrates that a reasonable jury could have found Wilkinson guilty beyond a reasonable doubt. *See* State v. Berhanu, 2006 SD 94, ¶7, 724 NW2d 181, 183. The indictment alleged that the act in furtherance of the conspiracy was the purchase of

matches on or before January 4, 2006. While Wilkinson asserts the State did not prove the purchase occurred before January 4, 2006, the record indicates otherwise. Lois Polfus, a worker at Coburn's Grocery Store, testified Herding and Wilkinson purchased a large amount of matches in August 2005. The jury heard about this purchase, previous purchases of matches, evidence of methamphetamine use and manufacture and repeated contact between Herding, Bordwell and Wilkinson, along with Wilkinson's admission that the methamphetamine lab was all his. The evidence is sufficient to support the guilty verdict.

[¶36.] Second, the use of "on or about" language in the indictment does not prejudice the defendant when the date is indefinite both in the indictment and the evidence that the State presents during the trial. State v. Nuzum, 2006 SD 89, ¶18, 723 NW2d 555, 559. The State charged Wilkinson with crimes occurring "on or about January 24, 2006" and that is what the testimony and evidence proved. The evidence was sufficient to support the verdict. The State does not need to prove a conspiracy occurred during a specific time frame. See SDCL 23A-6-9; United States v. Urick, 431 F3d 300, 303-04 (8thCir 2005) (noting that "the use of the term 'on or about' in an indictment 'relieves the government of proving that the crime charged occurred on a specific date, so long as it occurred within a reasonable time of the date specified'" ) (quoting United States v. Duke, 940 F2d 1113, 1120 (8thCir 1991); United States v. White, 241 F3d 1015, 1021 (8thCir 2001)). In any event, there was evidence the conspiracy was still occurring as late as January 23, 2006 when the agents discovered a methamphetamine lab and other indications of drug manufacture and use.

[¶37.]    Finally, there was plenty of evidence to support the jury's verdict on the manufacture of a controlled substance charge. There was testimony about powder that looked like methamphetamine, but chemically was not and how it was likely a failed attempt in manufacturing methamphetamine. Chemist Roger Mathison testified that one of the bottles contained a methamphetamine water solution, which is part of the process in manufacturing methamphetamine. Finally, there was completed methamphetamine, plus dishes and tools with methamphetamine residue that are commonly used in manufacturing. Our review of this evidence and the record demonstrates the verdict is supported by the evidence.

[¶38.]    Affirmed.

[¶39.]    GILBERTSON, Chief Justice, and KONENKAMP, ZINTER, and MEIERHENRY, Justices, concur.